265 N.J. Super. 141 (1993)
625 A.2d 597
JOANN BRZOZOWSKI, PLAINTIFF,
v.
GEORGE BRZOZOWSKI, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Middlesex County.
Decided: March 10, 1993.
*142 Brian P. Latimer for plaintiff (Jacobowitz, Grabelle, Reich & Defino attorneys).
Nicholas C. Apicelli, for defendant.
PALEY, J.S.C.
The issue presented in this case is whether a father who shares joint legal custody of a child may enjoin the mother, the residential parent, from authorizing non-emergent surgery for the child.
The parties were married on November 6, 1977. Their daughter, Kaleena, was born on December 21, 1983. The parties were divorced on December 18, 1990; they resolved all issues between them by written agreement (incorporated within the Judgment of Divorce) which provides, in pertinent part:
(A) The parties shall have joint custody of Kaleena. Joint custody shall be defined as the mutual cooperation and mutual decision making respecting Kaleena's health, education, and welfare. It is understood, however, that the day-to-day decision making affecting the child's well-being shall be made by the parent with whom Kaleena is residing at the time.
(B) In the event of any unreimbursed medical expenses [for Kaleena], then the parties shall share in the expense with the wife paying 50% of the unreimbursed medical expenses and the husband paying 50% of the unreimbursed medical expenses.
(C) Neither party shall incur any major medical expense without the knowledge and consent of the other party unless it is of an emergency nature.
According to the largely uncontroverted affidavits submitted, and affording every reasonable inference from those affidavits in support of the applicant's position, on or about May 17, 1992, Kaleena's father, the non-residential parent, was riding a bicycle with Kaleena perched on the handlebars. The bicycle fell; Kaleena *143 fell head-first to the ground. On May 22, 1992, Kaleena's mother, the residential parent, brought her to a Dr. Heller for diagnosis and treatment; Dr. Heller found an obstruction to the child's nose resulting from the injury but advised, in light of the child's tender age (then 8), that he "wait and see". In the next several months, the mother took Kaleena to Dr. Heller twice more; Dr. Heller concluded that the condition was not correcting itself and recommended out-patient surgery. Accordingly, surgery to correct the obstruction, along with a tonsillectomy and an adenoidectomy, was scheduled for August 24, 1992, more than three months after Kaleena's accident.
The father was duly informed of Dr. Heller's recommendations. On August 3, 1992, he took his daughter to Dr. G. Korovin, an Eye, Ear, Nose, and Throat specialist in Manhattan, for an examination. Dr. Korovin provided a "second opinion" letter on August 6, 1992, whereby she concluded that neither "a tonsillectomy, adenoidectomy, or any nasal surgery is necessary at the present time. Although a tonsillectomy and adenoidectomy may not be harmful, there is no clear indication for the surgery. No nasal surgery is indicated at this time." Defendant forwarded a copy of Dr. Korovin's report to the mother and to Dr. Heller; he also asked the mother to reconsider her position.
The father also took his daughter to Dr. George Beecher, M.D., an otolaryngologist. Dr. Beecher noted that the child had a deviated septum but observed no symptoms referable to this condition and noted that the child could breathe air around the septum. He concluded that a tonsillectomy, an adenoidectomy, and surgery to correct the deviated septum was not necessary. He noted that the tonsillectomy and adenoidectomy would not be harmful if done correctly but concluded that no surgery was indicated.
When the father received no response to his request that surgery be reconsidered, he sought to restrain the mother from scheduling the surgery by order to show cause. She has agreed *144 to defer the surgical procedure prescribed by Dr. Heller until this decision is rendered.
Beck v. Beck, 86 N.J. 480, 432 A.2d 63 (1981), is the seminal case addressing joint custody in this State. There, the New Jersey Supreme Court held that joint custody awards comport "with the established policy of the state." 86 N.J. at 485, 432 A.2d 63. The Court held:
Under a joint custody arrangement legal custody  the legal authority and responsibility for making `major' decisions regarding the child's welfare  is shared at all times by both parents. Physical custody, the logistical arrangement whereby the parents share the companionship of the child and are responsible for `minor' day-to-day decisions may be alternated in accordance with the needs of the parties and their children. 86 N.J. at 486-487, 432 A.2d 63.
Primarily, the Beck Court was concerned about the isolation of a child from a noncustodial parent; the placing of heavy financial and emotional burdens on the custodial parent; and the cost to the child(ren) of becoming subjects of bitter custody contests and pre- and post-judgment tensions. 86 N.J. at 486, 432 A.2d 63. Accordingly, the Court stated:
"Through its legal custody component joint custody seeks to maintain [attachments to both parents] ... by permitting both parents to remain decision makers in the lives of the children."
The joint custody arrangement sanctioned in Beck was viewed as an alternative to sole custody, acceptable only in those few cases where both parties exhibit a potential for cooperation in matters of child-rearing. 86 N.J. at 501, 432 A.2d 63. With no small degree of foresight, the Supreme Court recognized the potential lack of cooperation as the most "troublesome" aspect of a joint custody arrangement. 86 N.J. at 498, 432 A.2d 63.
Before Beck v. Beck, supra, was decided, few courts had considered the implications of "joint custody". In Asch v. Asch, 164 N.J. Super. 499, 397 A.2d 352 (App.Div., 1978), for example, a non-residential parent sought, post-judgment, to prevent the residential parent from enrolling their daughter in Catholic school. The parties' divorce agreement gave them "joint custody" and required the parties to confer with each other on all major matters affecting the welfare of the child; the agreement contained no method for *145 resolving disputes. On review, the Appellate Division stated: "It is axiomatic that the court should seek to advance the best interests of the child where her parents are unable to agree on the course to be followed." 164 N.J. Super. at 505, 397 A.2d 352. Furthermore, "The courts should seek to minimize, if possible, conflicting pressures placed upon a child and to give effect to the reasonable agreement and expectations of the parents concerning the child's religious upbringing before their mutual relationship foundered, subject to the predominant objective of serving the child's welfare comprehensively" (emphasis added) Id. An articulated premise of the Appellate Division's reasoning is that, absent clear evidence to the contrary, the residential parent is the parent most appropriate to decide on questions of the child's religious upbringing.
This analysis is not substantively different from that of Donahue v. Donahue, 142 N.J. Eq. 701, 61 A.2d 243 (E. & A. 1948). There, the noncustodial parent was Catholic, the custodial parent Jewish. The noncustodial parent had complained that the children were receiving no religious education; the custodial parent then enrolled the children in Hebrew school. The Court did not interfere with the custodian's decision. Cf. Boerger v. Boerger, 26 N.J. Super. 90, 97 A.2d 419 (Ch. Div. 1953), in which the court permitted the residential custodial parent (by agreement, the legal custodian) to determine the children's religious training. See also Wojnarowicz v. Wojnarowicz, 48 N.J. Super. 349, 137 A.2d 618 (Ch. Div. 1958): "once custody is awarded, the courts are loath to interfere with the religious training sanctioned by the custodian." 48 N.J. Super. at 354, 137 A.2d 618.
Perhaps the signal case involving a court's unwillingness to interfere with decision-making of the residential parent is Pogue v. Pogue, 147 N.J. Super. 61, 370 A.2d 539 (Ch. Div. 1976). There, before any formal custody order had been entered, the nonresidential parent, concerned about the child's poor grades and trouble-making, asked the court to enjoin the child's playing league basketball.
The court noted:

*146 "The best interests of the child are served when the parents join together on matters of discipline. The child should not join one parent against the other ... However, when communication between the parents breaks down, the court cannot be asked to decide questions of routine discipline." 147 N.J. Super. at 63, 370 A.2d 539.
The Pogue opinion cites Boerger v. Boerger, supra, for the following:
"The parent to whom custody is awarded must logically and naturally be the one who lawfully exercises the greater control and influence over the child. The [residential parent], who lives with the child more than six days a week, as contrasted with the [nonresidential parent's] limited visitation ... is the one who actually rears the child and shapes its moral, mental, emotional, and physical nature." [26 N.J. Super. at 104, 97 A.2d 419].
Pogue holds that the court "will not interfere, by holding a hearing or otherwise, with the day-to-day discipline of the custodial parent unless some basic problem involving the welfare of the child is involved." 147 N.J. Super. at 64, 370 A.2d 539.
There is little authority addressing how parents are to address medical disputes regarding the children. In Stackonis v. Williamson, No. 17-83-7, 1984 Ohio Ct. App. West Law 8021, at [*]3, the court, in dictum, noted that a court rule requiring consultation with the non-custodial parent on the medical needs of the children did not deprive the custodial parent of the authority conferred by law upon that parent. See also In re the Marriage of Dempster, 809 S.W.2d 450 (Mo. 1991).
In Holl v. Holl, 815 P.2d 379 (Alaska 1991), an Alaska Supreme Court decision, the Court addressed the propriety of a trial court's award of sole custody of three children to one parent. In affirming the trial court, the Alaska Supreme Court stated:
"The custodial parent  regardless whether there is a sharing of legal custody  will determine such things as what the children eat and wear, daily responsibilities around the home, curfews, what school the child attends, and the extracurricular activities of the child. Among the matters of significant concern in which both parents ought to be involved include permission to marry before age 16, whether to approve elective surgery, whether to remain in school, what to do after high school, and what to do with the child's property. Of these, permission to marry requires both parents to approve. The other matters generally only require one parent's approval even in a unitary family." 815 P.2d at 382.
*147 It therefore appears that, barring specific language in an agreement or order, see Vazquez v. Vazquez, 443 So.2d 313 (Fla.App. 1983), and regardless of the words used to describe the custodial relationship, the residential custodial parent has been afforded somewhat more authority to decide issues in the event of a disagreement. The rationale for this, as expressed in Boerger v. Boerger, supra, is that the parent with whom the child resides most of the time probably knows that child best, because of day-to-day exposure to the child and to the child's problems.
Here, the parents disagree over a surgical procedure which, as surgical procedures go, appears almost innocuous. Defendant, a joint custodian, with the right to have contact, communication, and input, seeks to veto a decision made by the child's residential parent. Per Pogue v. Pogue, supra, this court will not sanction that position. It is fully consistent with the reasonable expectations of the parties, cf. Boerger v. Boerger, supra, that that parent given the responsibility for the day-to-day rearing of the children should be able to discharge that responsibility (subject, as always, to notification to, and dialogue with, the joint custodial parent).
The contrary holding will produce applications, emergent and otherwise, to the court whenever the parties cannot reach agreement. Cf. Novak v. Novak, 446 N.W.2d 422 (Minn.App. 1989), in which it was held that, where joint legal custodians disagree on the choice of schooling for the child, the trial court must resolve the dispute consistent with the child's best interests. Putting aside the real questions regarding judicial administration posed by this situation, any court should be reluctant to substitute whatever limited expertise it may have for the empirical knowledge and day-to-day experience of the parent with whom the child lives, except where there is a clear showing that an act or omission will contravene the best interests of the child. Here, no such showing has been made.
For the foregoing reasons, the application for permission to prevent the specific operations addressed above is denied. Plaintiff's *148 counsel will submit an order conforming to this decision in the form and manner provided by the Rules of Court.