660 A.2d 485

DEBRA PASCALE, PLAINTIFF–APPELLANT AND CROSS–
RESPONDENT, v. JAMES PASCALE, DEFENDANT–
RESPONDENT AND CROSS–APPELLANT.

Argued February 14, 1995—Decided July 10, 1995.

584

*Laura M. Le Winn* argued the cause for appellant and cross-respondent.

*Bruce I. Afran* argued the cause for respondent and cross-appellant.

The opinion of the Court was delivered by

GARIBALDI, Justice.

Debra and James Pascale are divorced, but share joint legal custody of their three minor children. Debra maintains physical custody of the children and is their "primary caretaker." This appeal involves the child support that both parents must contribute toward their children's support. In resolving that issue, we must determine whether the Pascales' custody arrangement is "nontraditional" and whether the parent who acts as the "primary caretaker" for the children after divorce should retain authority over the disbursal of child support that both parents must provide.

We decide those issues not in the context of a father or mother's custody rights, but in the context of the responsibilities of both parents to their children. The lodestar of our consideration continues to be the best interests of the child.

The other question presented by this appeal, unrelated to the first question, is whether stock options issued to Debra immediately after she filed for divorce are subject to equitable distribution.

## I

### CHILD SUPPORT

#### A. FACTS

Debra and James married on June 19, 1977, and had three children: a son, born in 1984, and twin daughters, born in 1986. Marital difficulties developed, and Debra filed a complaint for divorce against James on October 28, 1990. In response to Debra's motion for *pendente lite* support, the trial court on March 19, 1991, issued an order that required James to pay sixty percent of all shelter, transportation, and other costs for the support of the children, and allocated other costs between the parties.

On September 23, 1991, another trial court issued an order that granted the couple joint custody of the children, set forth a schedule of visitation for James, and designated Debra as the "residential custodial parent." Pursuant to that order, the trial court structured James's visitation or "parenting time" in the following manner. For the ten-and-one-half-month school year, James would have the children for dinner from approximately 5:30 p.m. to 8:30 p.m. on Wednesday and Thursday evenings; and each weekend, he would keep the children for a twenty-four-hour, overnight stay. During the approximately seven-week summer, the trial court ordered James to keep the children overnight on both Wednesday and Thursday. In addition, the trial court ordered the parties to alternate major holidays with the children.

By order dated April 3, 1992, the trial court compelled James to vacate the marital residence. At trial, James testified that he had moved to a fully furnished, three-bedroom house in Lawrence Township, New Jersey, approximately fifteen miles from the marital residence. However, after he had vacated the marital premises, James did not continue to comply with the March 1991 order to pay Debra sixty percent of the expenses needed for the children and maintenance of the marital home.

Following a six-day trial, the trial court granted a dual judgment of divorce. Under the terms of the divorce, the trial court incorporated by reference the child custody and "parenting time" order of September 23, 1991. The court clarified that James was not seeking and had not sought sole or joint physical custody of the children. The court refused James's request to term the custody arrangement between the parties as "nontraditional." The court found that James was not exempt from payment of a proportionate percentage of his salary to Debra, which equals fifty-eight percent of the amount needed for the support of their children. At the time of the trial, the court assumed that Debra had a gross annual income of $52,500 and James had a gross annual income of $72,500. In addition, the trial court ordered Debra to contribute from her own salary child support equalling approximately forty-two percent of the children's necessary expenses per year. Specifically, the trial court applied the Child Support Guidelines for income levels up to $52,000 of combined income, and then supplemented that guideline award with an additional support amount based on the remaining family income, the factors enumerated in *N.J.S.A.* 2A:34–23, and the quality of life desired by both parties for their children. That led the trial court to order James to pay child support to Debra of $1,250 per month for the first twelve months, to be reduced to $1,150 per month for the remainder of their childhood, with further reductions as each child becomes emancipated. Recognizing both parents' strong interest in remaining involved in the lives of their children but also recognizing the greater responsibility borne by

Debra in caring for the children, the trial court ordered that James pay his percentage of child support to Debra.

Both parties appealed. The Appellate Division reversed the trial court, finding that the Pascales' joint custody arrangement was nontraditional. In so doing, the Appellate Division defined a "nontraditional" custody arrangement as "visitation [in excess of] ... one day per week" for the non-custodial parent. 274 *N.J.Super.* 429, 443, 644 *A.*2d 638 (1994). The Appellate Division recognized that the trial court had followed the applicable Child Support Guidelines and the statutory criteria from *N.J.S.A.* 2A:34-23 to establish a support order for that nontraditional custodial arrangement, but found that the trial court had not explained its rationale for awarding $1,250 per month initially, which was to be reduced to $1,150 per month permanently on August 1, 1993. *Id.* at 444-45, 644 *A.*2d 638. The Appellate Division therefore remanded the matter to the trial court for reconsideration of the child-support order. *Ibid.*

Following the determination of the Appellate Division, each party filed a petition for certification. Debra objected to the Appellate Division's ruling that the custody and visitation agreement was nontraditional and that therefore, the Child Support Guidelines, or an extrapolation therefrom, was not applicable. James petitioned this Court for review of the Appellate Division's finding that only the option for 1,800 shares of stock should be included in the marital estate for purposes of equitable distribution.

This Court granted certification to both parties. 138 *N.J.* 266, 649 *A.*2d 1286 (1994).

## B. CHILD-SUPPORT LAW

■ Child support after divorce is necessary to ensure that a child's basic needs are provided by his parents, who might otherwise neglect their responsibilities to maintain the child. Children of divorce are twice as likely to live in poverty as children who remain in two-parent households. Suzanne Bianchi and Edith

McArthur, U.S. Bureau of the Census, *Family Disruption and Economic Hardship: The Short–Run Picture for Children* 1–2 (1991). Children raised in a home with a female head of household live in poverty at more than four times the rate of children of couples who remain married. U.S. Bureau of the Census, *Child Support for Custodial Mothers and Fathers* 2 (1995) (hereinafter "Child Support"). The Legislature, therefore, has determined "that it is in the public interest to encourage parents [post-divorce] to share the rights and responsibilities of child rearing." *N.J.S.A.* 9:2–4.

The right to child support belongs to the child and "cannot be waived by the custodial parent." *Martinetti v. Hickman,* 261 *N.J.Super.* 508, 512, 619 *A.2d* 599 (App.Div.1993) (citations omitted). The court reasoned that a child-support decision must be based on an evaluation of the child's needs and interests and not on the conduct of the parents. *Ibid.* In addition, "[e]ach parent has a responsibility to share the costs of providing for the child while she remains unemancipated. *Lynn v. Lynn,* 165 *N.J.Super.* 328, 342–43 [398 *A.2d* 141] (App.Div.), *certif. denied,* 81 *N.J.* 52 [404 *A.2d* 1152] (1979)." *Ibid.* (other citation omitted). Most important, the non-custodial parent's failure in *Martinetti* to maintain ties with his daughter did not obviate his responsibility to contribute to her basic needs. *Id.* at 513, 619 *A.2d* 599.

Likewise, a non-custodial parent who did not undertake initially any of the financial burden of her children may not later escape responsibility to provide the custodial parent with funds for the continuing maintenance of her children. *Bencivenga v. Bencivenga,* 254 *N.J.Super.* 328, 331, 603 *A.2d* 531 (App.Div.1992). Rather, a rise in living expenses for the custodial parent obligated the non-custodial mother to begin to "shoulder some of the burden." *Id.* at 330, 603 *A.2d* 531. Finding that her voluntary departure from the world of gainful employment neither had foreclosed inquiry into the need for child support of her two children nor had negated her responsibility to supply that financial support, the court imputed income to her and imposed "a fair obligation to care

for her first two children like her obligations to her second two."
*Id.* at 331, 603 *A.*2d 531.

In a similar vein, *Ross v. McNasby* stands for the proposition
that one parent's responsibility to support her child financially
cannot be lessened by the other parent's interference " 'with
rights of custody or visitation granted by a court.' " 259 *N.J.Su-
per.* 410, 414, 613 *A.*2d 1174 (App.Div.1992) (quoting *N.J.S.A.*
2A:4–30.45) (citing *inter alia Daly v. Daly,* 21 *N.J.* 599, 609, 123
*A.*2d 3 (1956)). In another recent case, the Appellate Division
found that a non-custodial parent who had failed to provide
sufficient child support to the working, custodial parent to buy his
children winter coats could not later ask for a "credit" toward .
those arrears because he later paid for college tuition. *Guglielmo
v. Guglielmo,* 253 *N.J.Super.* 531, 539, 602 *A.*2d 741 (App.Div.
1992). The non-custodial parent's unmet responsibility to provide
support to his children immediately after the divorce was not
lessened by his later contributions to college education. *Id.* at
546, 602 *A.*2d 741. Because the responsibility to support runs
from parent to child, not parent to parent, the custodial parent
was not "unjustly enriched" by receiving sums and considering
them overdue payments for the support of those children. *Ibid.*

 This Court has consistently upheld the right of children
of divorce "to be supported at least according to the standard of
living to which they had grown accustomed prior to the separation
of their parents." *Ibid.* (citing *Lepis v. Lepis,* 83 *N.J.* 139, 150,
416 *A.*2d 45 (1980)). The financial obligations of both custodial
and non-custodial parents are "mainly determined by the quality
of economic life during the marriage, not bare survival," post-
divorce, for their children. *Lepis, supra,* 83 *N.J.* at 150, 416 *A.*2d
45. In addition, an increase in those children's needs, whether by
maturation of those children, rising cost of living, or a "more
unusual event," must be met by an increase in support by finan-
cially-able parents. *Id.* at 151, 416 *A.*2d 45. In determining both
the amount of money necessary to raise children of divorce and
the division of that obligation between working custodial and non-

custodial parents, "the talisman of concern is always the welfare of the child." *Guglielmo, supra,* 253 *N.J.Super.* at 546, 602 *A.*2d 741.

That both parents share the obligation to support their children, irrespective of their marital status, is well established in this state. Child support is the right of the child and the responsibility of both parents, not a chip won or lost by the custodial parent from the non-custodial parent during divorce.

## C. CHILD-SUPPORT GUIDELINES

In establishing the necessary level of child support, New Jersey courts look to the Child Support Guidelines found in *Rule* 5:6A. Pressler, *Current N.J. Court Rules* (1995). That Rule directs that such Guidelines

> *shall* be applied when an application to establish or modify child support is considered by the court. The guidelines may be modified or disregarded by the court only where *good cause* is shown. Good cause shall consist of a) the considerations set forth in Appendix IX–A or the presence of other relevant factors which may make the guidelines inapplicable or subject to modification, and b) the fact that injustice would result from the application of the guidelines. In all cases, the determination of good cause shall be within the sound discretion of the court.
>
> [*Ibid.* (emphasis added).]

Appendix IX–A of that Rule sets forth eight specific "[c]onsiderations which may make these Child Support Guidelines inapplicable or cause the child support amount to be adjusted." *Id.* at Appendix IX–A. One of those enumerated "considerations" has a direct bearing on the case at hand: "If the combined net family income exceeds $52,000.00, the court shall *apply the guidelines up to that amount and supplement the guidelines award with an additional support amount* based on the remaining family income and the factors enumerated in *N.J.S.A.* 2A:34–23." *Id.* at Appendix IX–A, ¶ (1)(b) (emphasis added). Appendix IX–A also states that "[t]hese child support guidelines are intended to be applied to cases having traditional custody and visitation arrangements." *Id.* at Appendix IX–A, ¶ (2). Appendices IX–B and IX–C provide exact percentages and weekly contributions for income levels up to $52,000. *Id.* at Appendices IX–B and IX–C.

■ In a traditional custody arrangement, when the income of the parties exceeds $52,000, the child-support award may be supplemented in accordance with *N.J.S.A.* 2A:34–23a, which provides:

> In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, the court in those cases not governed by court rule shall consider, but not be limited to, the following factors:
>
> (1) Needs of the child;
>
> (2) Standard of living and economic circumstances of each parent;
>
> (3) All sources of income and assets of each parent;
>
> (4) Earning ability of each parent, including educational background, training, employment skills, work experience, *custodial responsibility for children including the cost of providing child care* and the length of time and cost of each parent to obtain training or experience for appropriate employment;
>
> (5) Need and capacity of the child for education, including higher education;
>
> (6) Age and health of the child and each parent;
>
> (7) Income, assets and earning ability of the child;
>
> (8) Responsibility of the parents for the court-ordered support of others;
>
> (9) Reasonable debts and liabilities of each child and parent; and
>
> (10) *Any other factors the court may deem relevant.*
>
> [ (Emphasis added).]

■ Thus, the highlighted portions of *N.J.S.A.* 2A:34–23a support the conclusion that the Legislature intended courts to consider the tasks of the primary caretaker in allocating child-support awards for children whose parents' combined income exceeds $52,000 and for children whose parents choose nontraditional custody arrangements. Those portions also demonstrate that in either case, the trial courts have discretion in determining child support. The key to both the Guidelines and the statutory factors is flexibility and the best interest of children.

Initially adopted in 1986, the Child Support Guidelines from *Rule* 5:6A and Appendix IX are reviewed biennially by the Subcommittee on Child Support of the Family Practice Committee. In late 1994, that Subcommittee began review of the support schedules to base them on more current and accurate economic estimates of child-rearing expenditures and to increase the upper limit of those schedules. While we have not been presented with

any amendments to the Guidelines, we await those changes and assume that they will incorporate the trends in this state that are reflected in this opinion. Until then, child-support determinations must be made under the governing law.

■ Thus, we hold that a trial court has discretion to calculate child support for a family with a combined income over $52,000, using Appendices IX–A and IX–B to determine the baseline amount or percentage of the combined income attributable to both the primary and secondary caretakers, and combining that preliminary figure with a supplemental award subject to the provisions of *N.J.S.A.* 2A:34–23a, particularly a(4), which requires consideration of the tasks of the primary caretaker.

## D. DEFINING LEGAL AND PHYSICAL CUSTODY

Prior to their divorce proceeding, the Pascales entered into a mutual agreement to share joint legal custody of their three children, but to have Debra act as their "residential custodial parent." James asked this Court to term that custody arrangement as "nontraditional" to lessen the amount of child support that he must pay to Debra for their children.

■ In examining whether a custody arrangement is nontraditional, we discard the term "joint custody" used by the parties. That term is broad and misleading when applied to many situations. Instead, we recommend that in the future parties differentiate between the terms "legal custody" and "physical custody" in defining their status and the forms of relief that they are seeking from the court.

In common parlance, the term "joint custody" can mean the sharing of both physical and legal custody of children, or the sharing of legal custody, but not physical or residential custody, between divorced parents. Despite the hopes of legal reformers, true sharing between divorced parents of both physical and legal custody of children is still rare in our society. Therefore, we reaffirm that "[p]roperly analyzed, joint custody is comprised of

two elements—legal custody and physical custody," and find it important to break down the term "joint custody" into legal and physical custody in reviewing a court's determination of child support. *Beck v. Beck*, 86 *N.J.* 480, 486, 432 *A.*2d 63 (1981).

Joint legal custody, meaning the "authority and responsibility for making 'major' decisions regarding the child's welfare," is often shared post-divorce by both parents. *Id.* at 487, 432 *A.*2d 63. Joint legal custody provides rights and responsibilities to custodial parents, but it also confers rights with less significant responsibilities to non-custodial parents. Martha A. Fineman, *The Neutered Mother, The Sexual Family, and Other Twentieth Century Tragedies* 83 (1995) [hereinafter *The Sexual Family* ]. Indeed, that type of joint venture is found in the majority of custody arrangements throughout the country today. Elizabeth S. Scott, *Pluralism, Parental Preference, and Child Custody*, 80 *Cal.L.Rev.* 615 nn. 28 & 66 (citing Catherine R. Albiston et al., *Does Joint Legal Custody Matter?*, 2 *Stan.L. & Pol'y Rev.* 167 (1990) (finding that in California, eighty percent of divorced parents have joint legal custody of their children); W.P.C. Phear et al., *An Empirical Study of Custody Arrangements*, in *Joint Custody and Shared Parenting* 142, 147 (Jay Folberg ed., 1984) (finding, in search of Massachusetts court records, that only ten percent of those families with joint legal custody also had joint physical custody); Robert J. Racusin et al., *Factors Associated with Joint Custody Awards*, 28 *J.Am.Acad.Child Adolescent Psychiatry* 164 (1989) (finding that joint physical custody is rare both in Vermont and New Hampshire)).

On the other hand, "joint physical custody" means joint "responsib[ility] for 'minor' day-to-day decisions" and the exertion of continuous physical custody by both parents over a child for significant periods of time. *Beck, supra*, 86 *N.J.* at 487, 432 *A.*2d 63. Although there is no established norm for such custody, experts cite common schedules for a child within a joint physical custody framework as spending three entire days with one parent and four entire days with another parent or alternating

weeks or even years with each parent. Judith S. Wallerstein & Sandra Blakeslee, *Second Chances: Men, Women and Children a Decade After Divorce* 257 (1989). Thus, the import from the voluminous literature on the subject is that "joint physical custody" means that the child lives day in and day out with both parents on a rotating basis. Numerous "parenting times" with a child do not constitute joint physical custody; to constitute joint custody, each parent must exert joint legal and physical custody over the child.

A review of New Jersey cases leads us to believe that "joint physical custody" is as rare here as it is in other states. The most common example of a time frame that constitutes joint physical custody is found in *Beck, supra,* 86 *N.J.* at 493–94, 432 *A.*2d 63. In that case, the parties' arrangement was to alternate physical custody of their daughters every four months. *Id.* at 494, 432 *A.*2d 63. (finding that trial court had made proper determination that such joint physical custody could work).

In New Jersey, joint legal custody with physical custody given to only one parent is much more common. Time spent with the non-custodial parent may vary widely. In a recent case, the Appellate Division defined "liberal visitation" to the non-custodial parent as consisting of alternate weekends, one night per week, and alternate major holidays, including holidays like Labor Day and extended school holidays. *McCown v. McCown,* 277 *N.J.Super.* 213, 214, 649 *A.*2d 418 (1994). We find that that type of schedule for "parenting time" is common in cases of joint legal custody with only one parent having physical custody. Thus, the continuum in this State for the "parenting time" of non-custodial parents is wide and the cases of "joint physical custody" are rare.

### E. PRIMARY–CARETAKER CONCEPT

In cases of only joint legal custody, the roles that both parents play in their children's lives differ depending on their custodial functions. In common parlance, a parent who does not have physical custody over her child is the "non-custodial parent"

and the one with sole residential or physical custody is the "custodial parent." Because those terms fail to describe custodial functions accurately, we adopt today the term "primary caretaker" to refer to the "custodial parent" and the term "secondary caretaker" to refer to the "non-custodial parent."

Although both roles create responsibility over children of divorce, the primary caretaker has the greater physical and emotional role. Because the role of "primary caretaker" can be filled by men or women, the concept has gained widespread acceptance in custody determinations. *See* David L. Chambers, *Rethinking the Substantive Rules for Custody Disputes in Divorce,* 83 *Mich.L.Rev.* 477 (1984); Richard Neely, *The Primary Caretaker Parent Rule: Child Custody and the Dynamics of Greed,* 3 *Yale L. & Pol'y Rev.* 168 (1984); *see also* Martha A. Fineman, *Dominant Discourse, Professional Language, and Legal Change in Child Custody Decisionmaking,* 101 *Harv.L.Rev.* 727 (1988). Indeed, many state courts often determine custody based on the concept of "primary caretaker." *E.g., Burchard v. Garay,* 42 *Cal.*3d 531, 229 *Cal.Rptr.* 800, 724 *P.*2d 486 (1986); *Maureen F.G. v. George W.G.,* 445 *A.*2d 934 (Del.1982); *Agudo v. Agudo,* 411 *So.*2d 249 (Fla.Dist.Ct.App.1982); *Rolde v. Rolde,* 12 *Mass.App.Ct.* 398, 425 *N.E.*2d 388 (1981); *Maxfield v. Maxfield,* 452 *N.W.*2d 219 (Minn.1990); *Riaz v. Riaz,* 789 *S.W.*2d 224 (Mo.Ct.App.1990); *Burleigh v. Burleigh,* 200 *Mont.* 1, 650 *P.*2d 753 (1982); *Crum v. Crum,* 122 *A.D.*2d 771, 505 *N.Y.S.*2d 656 (1986); *Moore v. Moore,* 393 *Pa.Super.* 256, 574 *A.*2d 105 (1990); *Pusey v. Pusey,* 728 *P.*2d 117 (Utah 1986); *Harris v. Harris,* 149 *Vt.* 410, 546 *A.*2d 208 (1988); *Garska v. McCoy,* 167 *W.Va.* 59, 278 *S.E.*2d 357 (1981).

In one of the earliest cases using the concept of "primary caretaker," the Supreme Court of Appeals of West Virginia articulated the many tasks that make one parent the primary, rather than secondary, caretaker: preparing and planning of meals; bathing, grooming, and dressing; purchasing, cleaning, and caring for clothes; medical care, including nursing and general trips to physicians; arranging for social interaction among peers; arrang-

ing alternative care, i.e., babysitting or daycare; putting child to bed at night, attending to child in the middle of the night, and waking child in the morning; disciplining; and educating the child in a religious or cultural manner. *Garska, supra*, 278 *S.E.*2d at 363. As do many other jurisdictions, we find that that State's highest court's definition articulates many of the duties of a primary caretaker.

Factoring the role of the primary caretaker in child-support matters will serve the child's best interest. Accordingly, we adopt the concept of primary caretaker and establish standards to allocate the financial resources between separated and divorced parents who have chosen to have one parent be the primary caretaker and the other parent be the secondary caretaker. That arrangement may have been patterned during their marriage or may have been chosen during divorce proceedings. Most important, the person who continues as or becomes the primary caretaker may be father or mother. More fathers are becoming primary caretakers. *Child Support, supra*, at 1 (finding 1.6 million custodial fathers to 9.9 million custodial mothers). All caretaking represents a major contribution to our society. Fineman, *supra, The Sexual Family*, at 9. Thus, once the roles of primary caretaker and secondary caretaker have been established, the courts should make determinations about child support based on the assumption of those roles.

In producing a stable financial and legal foundation post-divorce for the children of divorce, courts should allow the primary caretaker to provide the children with their basic needs and the secondary caretaker to maintain a close relationship with the children. For the success of that structure, it makes sense that the person who has assumed the role of primary caretaker not be involved in a daily relationship with the secondary caretaker about the financial needs of the children. Rather, when joint custody is merely legal in nature, the primary caretaker should be accorded autonomy over the day-to-day structure of the new family in which he or she is the primary caretaker. That structure is established

by the courts, not to leave out the secondary caretaker, but to assure that the child is as undisturbed as possible in the implementation of the child's parents' decision to make one parent the child's primary caretaker. The primary caretaker who makes those day-to-day decisions needs autonomy over the financial resources drawn from both parents' salaries to effectuate those decisions without endless discussion with the secondary caretaker.

## F. THE PASCALES' CUSTODY AGREEMENT

■ James asserts that his "parenting time" with his children constitutes a "nontraditional" custody arrangement. According to James's testimony at trial, he cares for the children during the ten-and-one-half-month school year on two weeknights from approximately 5:30 p.m. to 8:30 p.m., and on each weekend he cares for them during one, twenty-four-hour, overnight stay. During the remaining seven weeks of the year, the children's summer vacation, he testified that he takes turns with Debra caring for their children. However, James's assertion that that arrangement changes a situation of only joint legal custody to one of a "nontraditional" physical arrangement approximating joint physical custody is in direct conflict with the governing law of our state. *Supra,* at 597, 660 *A.*2d at 492. In accord with the binding legal agreement between the parties that grants James only joint legal custody, the Pascales' arrangement parallels the norm in our society of physical custody to the primary, not the secondary, caretaker.

James has not presented sufficient evidence that the arrangement at hand is anything other than a "traditional" one. For example, having the children one day each weekend, rather than alternate weekends, results in the same amount of time for him over the course of a year as the prototypical secondary caretaker. While he shares joint legal custody with Debra, only Debra has physical custody of the children and only she acts as their primary caretaker. It is Debra who, more than eighty percent of the year, wakes the children at 6:00 a.m., assists them in bathing and

dressing, prepares their breakfast and lunch, and gets them to school, camp, or extracurricular activities. For the latter task, she works "flex hours" during the workweek, to enable her to drive the children to school on certain days. Those tasks that Debra performs for the children are typical of the tasks performed by a primary caretaker. *Supra,* at 598–99, 660 A.2d at 493. Thus, based on all the foregoing factors, we reject James's assertion that his visitation approximates the "nontraditional" custody defined by this Court in *Beck, supra,* and agree with the trial court that the Pascales have a traditional custody arrangement.

Divorced parents remain fully responsible for their children, regardless of the custody arrangement that they choose or the court orders. When divorced parents are unable to agree on the proper care and level of financial support for their children, courts must step in and act as an objective arbiter, always with the best interests of the children in mind. That is what the trial court did. Because the Pascales' combined income exceeds $52,000, the trial court based the final child-support figures on its consideration of the factors set forth in *N.J.S.A.* 2A:34–23—the same factors a court should refer to in determining child support in a nontraditional custody arrangement—as well as the governing Child Support Guidelines of *Rule* 5:6A.

Nonetheless, the trial court's use of those factors in this case does not change the Pascales' custody arrangement from traditional to nontraditional. The trial court's determination that the Pascale's custody arrangement is traditional rather than nontraditional is consistent with our view that visitation in excess of one day per week for the non-custodial parent does not constitute a nontraditional custody arrangement.

## G. THE PASCALES' CHILD–SUPPORT AGREEMENT

In determining the proper amount of child support and allocation of other expenses between James and Debra, the trial court took great pains to assure that both parties would have to pay their fair share of the children's basic needs and that the

parent who assumed the role of primary caretaker, Debra, would be given autonomy and authority over the disbursal of child support ordered by the court. The trial court's calculation of the various expenses of the parties was as meticulous and clear as its comprehension of what does and does not constitute a "nontraditional" custody arrangement. In effect, the trial court found that the children's yearly need exceeded $25,000 and that James would be responsible for fifty-eight percent and Debra would be responsible for forty-two percent of their children's needs, a reflection of the breakdown of their combined income.

Following *Walton v. Visgil*, 248 *N.J.Super.* 642, 649, 591 *A.*2d 1018 (App.Div.1991), the trial court below correctly stated that when a family's combined income is above $1,000 per week, "it is appropriate that one must add on, one must not subtract" from the amount of money expected to be spent by parents of three children with that income level. In accord with *Lepis* and *Guglielmo, supra,* the trial court determined that the parties had chosen an above average, but appropriate, standard of living for their children.

Given that standard, however, the Pascales could not maintain two large and equal houses for both the children's daily living with Debra and their visitation with James. Splitting a once-joint income is inevitable in divorce. Confronting that dilemma, the trial court reasoned correctly that the parties' choice to live separately—yet maintain the children at the same level—dictated that the ex-spouses could not live equally: Individually, they cannot maintain the standard that they achieved as a married couple. Accordingly, the children were to remain in the larger house with the primary caretaker who cares for them on a daily basis.

The court found Debra's concession to sell the marital home in five years, when the oldest child was to begin high school, to be reasonable and in the best interests of the children. The court also found it indicative that she was willing to accept a decrease in her children's standard of living—including a move to a smaller

house to be purchased in late 1997—as a necessary result of divorce and the splitting of the Pascales' formerly combined income. The trial court, however, found that James had not demonstrated why he needed a house of equal size when he was not the primary caretaker of the children, and lived in a fully furnished, three-bedroom house in Lawrence Township. Instead, the court reasoned that Debra's claims, not James's claims, corresponded with the financial reality of maintaining three children at a living standard comparable to that enjoyed pre-divorce as well as maintaining two adults in separate households on the same combined income, post-divorce. On this record, we are satisfied that the trial court properly balanced the housing interests of Debra and James in the context of the children's reasonable needs. Nevertheless, in analogous situations, we would deem it appropriate for trial courts, in structuring child-support awards, to take into account the interests of both parents in maintaining housing accommodations suitable for their custodial role, emphasizing the needs of the primary caretaker but simultaneously attempting to reflect the reasonable needs of the secondary caretaker.

In deciding the percentage of that total amount to be allocated to each parent, the trial court considered James's income to be $790 less annually than what he had presented throughout trial and Debra's income to be $500 more annually than what she had presented at trial, $72,500 and $52,500, respectively. The court then determined the breakdown of those figures into percentages of responsibility for the children's needs, fifty-eight percent to James and forty-two percent to Debra. Invoking *Rule* 5:6A, the trial court then calculated the baseline child support for a couple earning $52,000 or more and applied those percentages in the following manner. Using the figures found in Appendix IX–C of *Rule* 5:6A, the court chose to use a median guideline figure for weekly support of a family with three children and an income of $1,000 per week—$386. With that median figure, the baseline need for the Pascale children would be $20,072, per year.

Applying *Walton, supra,* 248 *N.J.Super.* at 649–51, 591 *A.2d* 1018, the court then added to, rather than subtracted from, that baseline. After listening to five days of the parties' testimony and their almost unanimous agreement on the needs of their children, the trial court relied on Debra's detailed estimates for the representative amounts needed to maintain the children. Referring to the factors found in *N.J.S.A.* 2A:34–23a, the trial court found that the actual need was greater than $25,000 per year. In so doing, the court focused on the fact that both James and Debra Pascale wanted to maintain comfortable lifestyles for their children, particularly high quality, year-round child care, which as working parents they both wanted, and various enrichment programs. For example, the court accepted that that type of child care cost at least $618 per month, consisting of daily child care for the twins and $4,000 for summer day camp for all three children. The court acknowledged that part of Debra's gross income would automatically be spent to pay for summer day camp and that Debra would also pay for daily child care. Thus, relying on many such examples, the court valued at over $25,000, the children's basic, year-round needs.

Finding that the children's needs and the parent's choices for education and extracurricular activities were "substantial," the trial court then divided that need by the percentage of income attributed to each parent, taking into account Debra's constant responsibility as the children's primary caretaker to pay for child care during the school year and the summer. Based on that calculation, the court found that James's fifty-eight percent and Debra's forty-two percent contributions to their children's yearly needs would equal approximately $1,230 per month and $890 per month, respectively.

After providing for large and constant expenses of the children via child-support contributions between the Pascales, the trial court then ordered the allocation of other expenses for the children, specifying either the primary or secondary caretaker as responsible for particular expenses. For example, after listening

to voluminous testimony about the child care that both parties agreed was necessary for their children, the court found that James's child-support payments were to be inclusive of any contribution to child care and babysitting expenses for the children. For medical care, orthodontia, and religious training, Debra assumed a greater burden than James. Making Debra responsible for health insurance coverage for the children, the trial court ordered the parties to share any medical expenses for the children not reimbursed by Debra's health insurance, finding that James would pay the first $500 per year toward the aggregate unreimbursed medical expenses for the children, followed by a sixty-to-forty-percent split between James and Debra thereafter. In addition, the trial court ordered Debra to be responsible for all orthodontia. Also, the trial judge ordered the parties to divide the costs of religious training for their children, but made Debra responsible for all summer day camp expenses. However, the total amount to be spent by each parent per month equalled their children's basic needs, given their parents' choice of lifestyles for them.

The trial court did not allow Debra the $1,500 per month child support that she had requested that the court order from James. After recognizing that the Pascales' income exceeded the amount found in the guidelines, the court stated:

> *[L]ooking at the parties' level of expenses,* [and] recognizing that the plaintiff's demand in this case is $1,500 per month, I have concluded that the order of the Court will be that the defendant will pay the monthly sum of $1,250 per month *starting August 1, 1992 and extending until August 1, 1993;* thereafter, it will be reduced to $1,150 per month which will remain as it is until the emancipation of the children.
>
> [ (Emphasis added).]

While the Appellate Division found that the trial court should have more carefully set forth its findings of how it arrived at the specific amount(s), $1,250 reduced to $1,150, of child support that James must pay, we infer that in its discretion, the trial court lowered James's amount of child support due to James's assumption of the role of secondary caretaker of his children. In that role, James frequently sees his children, provides them with some

dinners, takes them to their activities, and keeps them overnight in accordance with the schedule set out in the custody order. Through that role, James plays an integral and on-going part in his children's lives, but he is not their primary caretaker.

Based on the trial court's meticulous and detailed analysis of the children's expenses and its careful and just determination of which. parent should pay for particular expenses, we find that the trial court properly calculated the child-support contributions of each parent according to the governing procedure. When the combined income of the divorced parents exceeds $52,000, the Child Support Guidelines provide that a trial court may, in its discretion, consider the factors enumerated at *N.J.S.A.* 2A:34–23, to add to the baseline figure of child support. The trial court took careful measures to assure that both parties pay their fair share of the children's basic needs, that the primary caretaker be given autonomy and authority over the disbursal of child support ordered by the court, and that the secondary caretaker retain a small portion of the amount of total need for parenting time. We, therefore, affirm the trial court's award and find no need for remand in this matter.

One court recently reasoned:

[R]egardless of the words used to describe the custodial relationship, the residential custodial parent has been afforded somewhat more authority to decide issues in the event of a disagreement. The rationale for this, as expressed in *Boerger v. Boerger*, [26 *N.J.Super.* 90, 104, 97 *A.*2d 419 (Ch.Div.1953) ] is that the parent with whom the child resides most of the time probably knows that child best, because of day-to-day exposure to the child and to the child's problems.

... It is fully consistent with the reasonable expectations of the parties, ... that that parent given the responsibility for the day-to-day rearing of the children should be able to discharge that responsibility (subject, as always, to notification to, and dialogue with, the joint custodial parent).

The contrary holding will produce applications, emergent and otherwise, to the court whenever the parties cannot reach agreement.

[*Brzozowski v. Brzozowski*, 265 *N.J.Super.* 141, 147, 625 *A.*2d 597 (Ch.Div.1993).]

We agree with the *Brzozowski* court. To provide for the children of divorce, finalize living structures, and relieve stress from the child's life and the lives of both parents, grants of authority to the primary caretaker are necessary. This "child-centered view" of

the problems associated with child support is neither pro-father nor pro-mother, but pro-child. *Ira C. Lupu, The Separation of Powers and the Protection of Children,* 61 *U.Chi.L.Rev.* 1317, 1337 (1994). Such a grant of authority observes the guiding principle that child support runs between parent and child, rather than parent and parent.

## II

### STOCK OPTIONS

When Debra began her employment with Liposome Company on April 14, 1987, she was immediately granted the option to purchase 5,000 shares of stock in Liposome. As of the date of trial, Debra owned the following options:

| Date Granted | Number of Shares |
|---|---|
| April 14, 1987 | 5,000 |
| June 7, 1989 | 650 |
| November 30, 1989 | 5,650 |
| January 4, 1990 | 1,469 |
| November 7, 1990 | 4,000 |
| November 7, 1990 | 1,800 |
| November 15, 1991 | 1,500 |

Debra filed for divorce on October 28, 1990. Neither party disputed that the stock-option grants awarded prior to the filing of Debra's divorce complaint are subject to equitable distribution, and that the stock-option grant awarded on November 15, 1991, was not subject to equitable distribution. However, Debra has argued that the stock-option grants awarded to her on November 7, 1990, approximately ten days after she filed for divorce, were not subject to equitable distribution. Based on language in the accompanying transmittal letters, she asserts that the option for 1,800 shares was issued in recognition of past performance and that the option for 4,000 shares was awarded in recognition of a job promotion that imposed increased responsibility on her in the future.

The trial court found that neither of the two stock options granted on November 7, 1990, could be excluded from equitable distribution. That court found that those two stock options from the Liposome Company that were issued immediately after the divorce complaint had been filed were to be divided equally among the parties. Finding "that the case law supports a flexible approach in determining which assets are includable and which assets are not includable for equitable distribution," the trial court opined that it would be unfair to permit Debra "to retain fruits derived during marriage simply because of a technical determination regarding her choice of a filing date."

However, the Appellate Division found that only one of the two options awarded on November 7, 1990, approximately ten days after the filing of the divorce complaint, should have been included in the marital estate, while the other should have been excluded. 274 *N.J.Super.* at 437–40, 644 *A.*2d 638. The Appellate Division based that decision on its interpretation of the facts, finding that the option for 4,000 shares of stock was granted in recognition of a promotion in job responsibility and an increase in salary; therefore, that option was "more appropriately . . . designed to enhance future employment efforts" and should not have been included in the marital estate. *Id.* at 439, 644 *A.*2d 638. However, as to the other option for 1,800 shares of stock, the Appellate Division found that that option was granted in recognition of past employment performance. *Id.* at 440, 644 *A.*2d 638. That option, therefore, was properly includable in the marital estate notwithstanding the date-of-complaint rule based on equitable considerations, as discussed in *Kikkert v. Kikkert,* 177 *N.J.Super.* 471, 427 *A.*2d 76 (App.Div.), *aff'd o.b.,* 88 *N.J.* 4, 438 *A.*2d 317 (1981). 274 *N.J.Super.* at 440, 644 *A.*2d 638.

In his cross-petition for certification, James urged this Court to find that the Appellate Division had exceeded its scope of review in substituting its own findings of fact for those of the trial court because the record contained adequate and substantial evidence to support the trial court's conclusions.

Although the Legislature has amended the governing statute, *N.J.S.A.* 2A:34–23, several times since *Painter v. Painter*, 65 *N.J.* 196, 320 *A.*2d 484 (1974), the guiding principle of *Painter* remains: Property "clearly qualifies for distribution" when it is "attributable to the expenditure of effort by either spouse" during marriage. *Id.* at 214, 320 *A.*2d 484. On many occasions, this Court has declared that marriage is viewed as " 'a shared enterprise, a joint undertaking, that in many ways—is akin to a partnership.' Therefore, marital assets acquired in the course of that joint undertaking fairly should be included in the estate subject to equitable distribution." *Portner v. Portner*, 93 *N.J.* 215, 219, 460 *A.*2d 115 (1983) (quoting *Rothman v. Rothman*, 65 *N.J.* 219, 229, 320 *A.*2d 496 (1974)). The asset in dispute falls into that category.

The brightline rule of *Painter* is that the date on which a divorce complaint was filed fixes the marital termination date for equitable distribution purposes. 65 *N.J.* at 218, 320 *A.*2d 484. The exceptions to the *Painter* rule have usually followed the pinpointing of a timeline for "irretrievable breakdown" of a marriage. *See, e.g., Brandenburg v. Brandenburg*, 83 *N.J.* 198, 205–06, 416 *A.*2d 327 (1980). Those cases are factually specific with focus on the timing of marital breakdown.

This case, however, is not concerned with whether the marriage ended prior to the date of complaint, but whether certain assets distributed after that date were acquired during the marriage, and consequently are subject to equitable distribution. The focus thus becomes whether the nature of the asset is one that is the result of efforts put forth "during the marriage" by the spouses jointly, making it subject to equitable distribution.

To refute such a presumption, the party seeking exclusion of the asset must bear " 'the burden of establishing such immunity [from equitable distribution] as to any particular asset.' " *Landwehr v. Landwehr*, 111 *N.J.* 491, 504, 545 *A.*2d 738 (1988) (quoting *Painter, supra*, 65 *N.J.* at 214, 320 *A.*2d 484). In *Kikkert, supra,* this Court approved of the Appellate Division's characterization of a pension benefit as "the result of direct or indirect efforts

expended by one or both parties to the marriage—it is additional compensation for services rendered for the employer and a right acquired during the marriage." 177 *N.J.Super.* at 476, 427 *A.*2d 76. Consequently, in that case, the court remanded the matter to the trial court for a determination of the present value of the non-pensioned spouse's interest in the pension as part of the marital estate subject to equitable distribution. *Id.* at 477–78, 427 *A.*2d 76.

In a similar manner, stock options awarded after the marriage has terminated but obtained as a result of efforts expended during the marriage should be subject to equitable distribution. The inequity that would result from applying inflexibly the date of complaint rule is obvious. James would be denied the benefit of stock options that were earned by Debra during the marriage, but were not awarded to her until slightly after the marriage terminated. Serious mischief could arise under such a hard-and-fast rule. For example, a spouse considering divorce might file her complaint just before she expects to receive a large bonus or commission, simply to deny her spouse the benefit of that asset when the court determines the value of the marital estate.

Although we understand both Debra and the Appellate Division's distinctions between the two stock options, we are unconvinced that one is subject to equitable distribution and the other is not. Despite the award of the option for 4,000 shares of stock in recognition of Debra's promotion, the trial court made a credible finding after listening to many days of testimony that that promotion came about as a result of the excellent service that she had provided to the company during her marriage. Like a spouse who cooks and cleans while one spouse rises to the top of a company, James in his role as husband and father contributed in some way to Debra's success, which increased her worth for that promotion. We credit James for being a supportive spouse as we also acknowledge his supportive role as a secondary caretaker of his children. Debra has not proven that the effort to attain the two stock options awarded on November 7, 1990, was not put forth

during her marriage. Like the pension benefits in *Kikkert, supra,* Debra's stock options are a form of deferred compensation for efforts expended during the marriage. As those efforts were expended during the marriage, equity demands that the options be recognized as marital assets, and thus be subject to equitable distribution.

## III

## *CONCLUSION*

James and Debra Pascale entered into a traditional custody arrangement that provided that they share joint legal custody of their children, but that Debra be the primary caretaker. The trial court properly recognized that this arrangement was traditional. Many different types of custody arrangements may constitute traditional custody arrangements. Basically, we leave the decision concerning the type of custody arrangement to the sound discretion of the trial courts, mindful of the parameters of nontraditional custody established in *Beck, supra,* 86 *N.J.* at 486–87, 432 *A.*2d 63, and of the traditional custody arrangement of the Pascales. We do emphasize, however, that many traditional custody arrangements, like that of the Pascales, will include more than one night of parenting a week for the secondary caretaker of the children.

Our holding today as well as the prior decisions of this Court create a presumption governing cases of joint legal custody that in regard to physical custody, the parent who acts as the "primary caretaker" for the children after divorce should retain authority over the child support that both parents provide. *See Lepis, supra,* 83 *N.J.* at 161–62, 416 *A.*2d 45. That structure of familial roles post-divorce is a "traditional" custody arrangement. To rebut such a presumption, the secondary-caretaker parent's scope of responsibility for those children must be evaluated by a trial court to see if it approximates that of the primary caretaker. If that presumption is not overcome, then the primary caretaker who shoulders the majority of responsibility for those children

must control the child support deemed necessary by the trial court for the rearing of the children. One of the major reasons that the primary caretaker of children of divorce must retain such authority over most aspects of a child's life, including the disbursal of child support ordered by the court from the secondary caretaker, is to prevent economic regression of the children of divorce.

The trial court properly recognized that the parameters established at *N.J.S.A.* 2A:34–23a should guide a court when determining child-support awards in a traditional custody arrangement when the parents' combined income exceeds $52,000. Within such a traditional custody arrangement, the trial court, in determining the level of child support, must consider several factors: the tasks performed by the primary caretaker of the children of divorce; the necessity that such primary caretaker receive most of the secondary caretaker's child support; and the necessity that such primary caretaker have the autonomy to decide how that child support ordered by the court is to be disbursed to provide for the basic needs of the children. In this case, the trial court's decision dealt in a just manner with common problems of divorce, including the splitting of a joint income that can rarely provide two complete and similar homes for the children of divorce, and the economic regression of those children and their primary caretakers. Because the court correctly determined the custody agreement to be traditional, it did not find that James should retain authority over a substantial part of his child support. Instead, it vested authority to disperse the financial means for the children's basic needs in their primary caretaker, a role that can be assumed by either parent post-divorce.

With regard to the stock options, we continue to balance the need for definitiveness embodied in the date-of-complaint rule with the need for flexibility inherent in equitable distribution. Assets or property acquired after the termination of the marriage, but as a reward for or a result of efforts expended during the marriage, normally will be includable in the marital estate and thus subject to equitable distribution.

We affirm only so much of the judgment of the Appellate Division that includes, for purposes of equitable distribution, the option for 1,800 shares of stock. We reinstate the trial court's order for child support in its entirety and its inclusion of the option for 4,000 shares of stock in the marital estate for purposes of equitable distribution.

*For affirmance in part; reversal in part*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, STEIN, GARIBALDI and COLEMAN—7.