**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0420-19T2

THOMAS P. DUFFY, JR.,

       Plaintiff-Respondent,

v.

MARIA I. PIERANTOZZI,

       Defendant-Appellant.

_____

          Submitted September 30, 2020 — Decided October 13, 2020

          Before Judges Haas and Mawla.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FD-08-0420-09.

          Maria I. Pierantozzi, appellant pro se.

          Puff & Cockerill LLC, attorneys for respondent (Christine C. Cockerill, on the brief).

PER CURIAM

    Defendant Maria I. Pierantozzi appeals from portions of an August 15, 2019 order relating to custody, parenting time, and expert fees. We affirm.

Defendant and plaintiff Thomas P. Duffy, Jr. began a relationship around 2003, which produced a daughter born in 2007, who is now thirteen years of age. Numerous court orders have been entered in this case; we summarize the ones relevant to the issues in this appeal.

In September 2008, plaintiff filed a complaint seeking joint legal custody, shared parenting time, child support, and other relief. Defendant filed responsive pleadings seeking sole legal custody, parenting time, child support, and other relief. In December 2008, the parties entered into a consent order, agreeing to joint legal custody, designating defendant the parent of primary residence and plaintiff the parent of alternate residence, awarding plaintiff parenting time on alternating weeks from Friday to Sunday, one mid-week overnight every week, and child support.

As the parties' daughter matured, plaintiff made an application for more parenting time in 2013, which resulted in a referral to mediation and entry of a consent order in May 2013, resolving some of the issues. The parties maintained their residential and legal custody designations. Regarding the latter, the parties agreed to "consult with each other regarding major issues affecting the child's health, education and general welfare, with a view to adopting harmonious policy." They agreed each would have access to information regarding the

A-0420-19T2

child's health, education, and extracurricular activities, and would notify the other regarding medical appointments and emergencies. They agreed to "foster a feeling of love and affection between the child and the other party" and each would "have reasonable telephone access to the child when they are with the other parent." The parties agreed each would complete the child's homework and assignments during his and her respective parenting time and each was "welcome and encouraged to attend any function, activity, practice or game" open to parents and to "show respect for[] the other parent at such functions, so as to maximize the child['s] comfort level and emotional well-being." The order also required defendant to cooperate and sign the documents necessary to ensure the child obtained a passport, the party traveling with the child to provide advance notice of the destination and location of their stay, and for the non-traveling parent to not unreasonably withhold consent to travel. Defendant also agreed to provide health insurance for the child.

The parties could not resolve the issue of parenting time and the court listed the matter for a plenary hearing. In June 2013, the day of the hearing, the parties entered into a consent order maintaining the pre-existing parenting time schedule, but extending the weekend parenting time to an overnight on Mondays, if the Monday was a holiday. The parties agreed plaintiff's girlfriend

3

was authorized to pick up and drop off the child from school and camp. They agreed no unilateral decisions would be made regarding the child's camp or "other major decisions" and plaintiff would have the right of first refusal over work related childcare in the event defendant was required to work.

In 2017, plaintiff made an application to enforce and increase parenting time by an overnight during the weekly mid-week parenting time. He certified that de facto he had been enjoying greater parenting time than set forth in the court order and that greater parenting time would provide the child with a "stable and consistent schedule with less back and forth between her two homes." Plaintiff also certified the child expressed a wish to spend more time with him. He noted the child, then ten years of age, was a "very mature young lady" and invited the court to interview her. Plaintiff also alleged defendant violated the prior court order by informing the child's summer camp that his girlfriend could not pick her up, violated the right of first refusal, took vacation during his holiday parenting time, failed to share her vacation itinerary, and violated the parties' agreement not to disparage the other parent to the child.

The court scheduled the matter for a plenary hearing and interviewed the child, however, the parties resolved the dispute in July 2017 and eventually signed a consent order in December 2017 memorializing their agreement. The

4

parties agreed to an equal shared parenting plan whereby defendant had every Monday and Tuesday, plaintiff every Wednesday and Thursday, and the parties alternated the weekends from Friday to Monday with "[e]ach parent's Friday attached to his or her own weekend, [as] that parent's custodial day." The parties agreed holiday parenting time "take[s] precedence over all other parenting time[,] [v]acations take next precedence, and then regular parenting time." The consent order confirmed the parties' mutual obligation to provide each other with travel and vacation itineraries in advance and would cooperate to renew the child's passport when it expired. The parties agreed "the child shall participate in activities that she is interested in, i.e. [f]all [s]occer 2017."

In May 2018, plaintiff filed an enforcement motion and also sought modification of custody designating him as the parent of primary residence. Defendant opposed the motion and sought an increase in child support. Plaintiff certified defendant took the child out of state for a vacation without informing him and he could not reach the child on her cell phone. He stated the child contacted him and informed him she was in Las Vegas, Nevada, where defendant's boyfriend resided at the time. Plaintiff certified the child's number was blocked and defendant

> refused to answer her phone or otherwise communicate
> with me. . . . I asked the local Nevada police

department to conduct a well visit at . . . [d]efendant's boyfriend's home . . . [and] [o]nly after this did . . . [d]efendant communicate with me. However, she would not tell me anything other than [our daughter] was with her, and that she was fine. [She] would not tell me where [our daughter] would be, nor would she tell me when [our daughter] would be back in New Jersey.

Plaintiff certified the child did not return to school the following Monday and when his attorney wrote to defendant seeking assurances of the child's return, there was no response. Plaintiff also certified defendant controlled his telephone contact with the child by requiring him to communicate through defendant and requiring the conversations to occur over the speaker. He claimed defendant refused the daughter's request to unblock plaintiff's number.

Plaintiff's certification stated he was seeking primary residential custody "due to . . . [d]efendant's continual, repeated and unrepentant violations of our joint legal custody, telephonic access and parenting time [o]rders." Plaintiff's certification relayed the daughter's desire to reside with him and her "reports that he[r] mother's moods are disturbing to her and that she constantly badmouths both myself, my family and [my girlfriend], who has been part of our household for years. [Our daughter] does not like this situation and she wants it to stop. It won't stop, so she wants to be removed from it." Plaintiff

6

asked the court to interview the child because "[t]he negativity extends to the [d]efendant texting nasty things [to the child], which is very upsetting to her."

Plaintiff's certification also alleged defendant deprived him of parenting time on Mondays which were holidays, scheduled her vacation during his holiday parenting time, and "took all of [his] regular parenting time days during the entire Christmas break including [his] New Year's Eve [h]oliday time." Plaintiff certified defendant unilaterally executed a contract for the daughter's orthodonture without his input or consent, depriving him of a second consultation or the ability to investigate "a more financially reasonable treatment plan." He also certified defendant failed to take the child to her fall 2017 soccer practices and games which occurred during her parenting time. As a result, he claimed the child's "confidence was shaken, given the fact that she did not have the benefit of full time participation" with her team.

Plaintiff certified defendant removed the child from her elementary school in Pitman to spend part of the day at St. Rose of Lima, a school defendant intended the parties' daughter to attend the following school year without notice. He stated: "The only reason I found out is because the Pitman elementary school notified me. When I asked [our daughter] about it, she was terrified that her mother would assume that [she] told me." Plaintiff also claimed defendant, who

7

served as room parent and yearbook aide, used her position to remove his email from school notifications and email groups, requiring him to seek assistance from the principal to be reinstated.

Plaintiff also certified defendant planned another trip to Las Vegas without informing him. However, the parties' daughter was sick and could not make the trip. According to plaintiff, defendant would not permit him to speak with the child to find out her condition and plaintiff only learned about the trip after the fact from their daughter. He also certified the parties' daughter did not enjoy the trips because defendant would leave her in a "Kids Quest" room inside the casino while defendant visited with her boyfriend.

In October 2018, the court executed an order for a plenary hearing, ordered the parties to attend co-parenting therapy, and ordered a custody evaluation which plaintiff was required to fund, subject to a final allocation. The court also ordered the child would participate in soccer, her telephone would be unblocked, and restrained defendant from traveling with her to Las Vegas.

A four-day plenary hearing occurred. On the first day, the trial judge interviewed the parties' daughter, who would turn twelve one week later and attended the Pitman Middle School. The child told the trial judge she preferred to spend more time with plaintiff because there were "[m]ore positives going to

that side. That's why I choose [d]ad's." When the judge asked her about defendant's involvement in soccer, the child said her mother sometimes came to see her play and she felt "[i]t's like a grudge taking me to soccer." She stated defendant never attended her dance activities. On the other hand, she stated plaintiff took her to soccer, tennis, and dance, and attended her recitals.

The child stated her relationship with defendant was not the "best" because "we get into fights a lot just about random things" and "[m]om yells at me sometimes." Conversely, she described her relationship with plaintiff as "really good." She explained the environment at plaintiff's home was better because she receives help with homework from plaintiff and his girlfriend and because there was not much to do at defendant's home as opposed to plaintiff's. When the judge pointed out that plaintiff resided in a single-family home and defendant resided in an apartment and that the child's room was larger at plaintiff's home, the child said the amenities "ha[d] nothing to do with anything."

The parties' daughter told the judge she did not enjoy the trips to Las Vegas because "there was nothing to do" and explained she was put in "Kids Quest" while defendant and her boyfriend enjoyed the casino. She explained the trips to Las Vegas "sometimes [occurred] during the school year and [she] hate[d] missing school." She also stated defendant took her to San Diego,

California to visit defendant's boyfriend without telling plaintiff where they were. Although the parties' daughter told plaintiff where she was, she stated: "Around my [m]om, I always get scared to call my [d]ad." Regarding telephone communication generally, she explained she has one telephone in each parent's home because "at my [m]om's if I ever bring my phone, she always tries to . . . snoop through it and . . . look and get all my passwords to everything."

Ultimately, the parties' daughter expressed her preference for residing with plaintiff stating: "I feel like it's more of a positive environment at my [d]ad's house. And it feels like a family. . . . I would rather spend the whole week at my [d]ad's house and alternate weekends."

The trial judge also heard testimony from the court-appointed custody evaluator, plaintiff, plaintiff's girlfriend, defendant, and defendant's custody expert.

The court-appointed expert testified he reviewed all of the discovery, the daughter's school records, a letter from her pediatrician, and a former court-appointed co-parenting counselor. The expert: conducted clinical interviews of the parties; conducted psychological testing of the parties, namely, the Millon Clinical Multiaxial Inventory (MCMI), Rotter Sentence Completion Test (RSCT), and the Parenting Stress Index Test (PSIT); interviewed plaintiff's

girlfriend; and solicited collateral information. In all, he testified he spent fifty hours to produce his report.

The expert testified plaintiff was "sincerely concerned about his daughter's welfare . . . [and] identified issues that he felt were not in his daughter's best interests . . . ." He testified plaintiff passed the MCMI, which measures character, personality traits, and general adjustment with "flying colors." The expert explained the RSCT is a projective test designed to express feelings on paper. Plaintiff's results evidenced he was "very family-oriented. He's happy with his family. He has a good balance between work and play. He is disciplined. He's a high-achiever." The PSIT measures parenting and character deficits, how a parent feels about his or her relationship with their child, and whether the child has any deficits that interfere with the parent's ability to relate to the child. Plaintiff's results revealed he had "a very good relationship with [the parties' daughter] . . . he's doing a good job and the child has no deficits that would make it difficult . . . for him to parent her."

The expert interviewed the child several times with each parent and individually, for a period totaling two and one-half hours. He noted although the child "is an [eleven and a half] year old . . . she really acts much older. She's

very smart, she's very mature, she's very sweet and she says what's on her mind."

He concluded she was thriving in plaintiff's home because

> [i]t's very organized. The significant other takes her to school in the morning, picks her up from school, takes her to activities on his days. She has a plethora of extracurricular activities. She loves what she does. She's had a part in choosing what she does. She's an excellent student.
>
> . . . .
>
> . . . She is encouraged to speak her mind and to share her feelings about things . . . .

The expert concluded plaintiff's home was conducive to the child's positive development, self-esteem, individuality, and independence.

The expert testified defendant was guarded, suspicious, defensive, anxious, and paranoid "that [plaintiff was] constantly pursuing her and victimizing her. . . . [Defendant] sees the dad and [his girlfriend] as her enemies and she tells that to the kid . . . ." He concluded defendant's concerns were unfounded because plaintiff "wants his child to have a good relationship with her mother because he knows that's best for the child[,]" and defendant failed to corroborate her claims. Based on the clinical interview, the expert concluded defendant's "focus really was [on] defending herself" rather than focusing on the child's needs. He stated: "I don't think[] she listens carefully to what the child

really wants."  As examples, the expert noted defendant did not want the child to play soccer even though the child wanted to and instead told the child she could do gymnastics, a sport in which the child had no interest.  The expert noted defendant compelled the child to attend CCD[1] classes and attempted to instill the child with improper notions, allegedly based on religion.  The expert stated: "[Defendant] takes interpretations out of context, as to what church teachings are.  So she says, for example, to the child, . . . that she'll never see her father after he dies because the father will go to hell and she will go to heaven."

The expert addressed defendant's performance on the psychological testing and concluded they showed she was "a troubled lady . . . she is very unsettled, has a lot of anger, is still very hurt and angry that [plaintiff] and she broke up ten years ago.  She basically wishes he would disappear and . . . I think, [it] makes her depressed."  The expert noted his conclusions were supported by the child who reported her "mother's moods are very unpredictable.  She doesn't know which mother she's going to see when she goes to the house.  Sometimes her mother is very happy and joyous and euphoric and other times, she's depressed and walks around the house crying and stays in bed."  According to the child, the environment in defendant's home was "morose . . . there's not a lot

---

[1] Confraternity of Christian Doctrine.

A-0420-19T2

of communication . . . [defendant] is on the computer most of the time . . . [she] yells a lot . . . [and] really doesn't cook[ or] clean" which the expert concluded would "suppress" the child's development and harm her.

The expert's collateral contacts with the co-parenting counselor also corroborated his conclusions. The counselor reported plaintiff was a "straight shooter. He says what he feels and he's accurate. [However, the counselor reported defendant] distorts things for her own purposes, that she's somewhat paranoid and passive-aggressive." The expert opined defendant's behavior would make the child very anxious and lead to clashes with defendant which would worsen over time.

The expert concluded plaintiff should be designated the parent of primary residence. Contrary to the child's wishes to see defendant every other weekend, the expert instead opined plaintiff should have one more day or three overnights during the school week and the parties should alternate weekends. He recommended the parties notify each other by the beginning of May of the vacation weeks they intend to take and the court include clear language regarding the daughter's passport to minimize the historical conflicts the parties have had. The expert recommended the non-custodial parent have telephone contact with the child once per day. He recommended defendant have individual

14

therapy before she and the daughter entered therapy. He explained the individual therapy was a prerequisite because defendant was "in denial . . . [and] stultifies this kid. She doesn't hear what she has to say and she has to stop and take stock of herself and understand that she is shooting herself in the foot."

Plaintiff's testimony was largely consistent with his certification in explaining the reasons why he sought primary residential custody. He explained in detail defendant's numerous violations of the custody and parenting time provisions and its adverse effects on the child.

He testified how defendant's refusal to support the child's athletics impacted her confidence and how defendant's unilateral scheduling of orthodontic treatment and failure to inform plaintiff she had lost her medical insurance placed the child's health at risk. Regarding the medical insurance, plaintiff recounted that defendant would not let him insure the child even though it came at no cost to defendant. Plaintiff explained how defendant blocked him and his girlfriend from the daughter's phone and the child "was distraught about it [because] we went from no communication, then to text blocking, then to hiding her phone and then to intimidating her every time she tried to contact me." He also explained how defendant failed to inform him or discuss with him the child's enrollment in CCD or share information about the program. He also

15

how defendant blamed the child for ruining her vacation when she was too sick to travel to Las Vegas.

Plaintiff testified he wanted to add Tuesday as an additional overnight to give the child consistency and stability during the week to continue to excel in school and in her activities. He noted the child began to earn straight As only after the parties switched to an equal shared parenting plan.

Plaintiff's girlfriend testified and corroborated both the court-appointed expert's conclusions and plaintiff's testimony. She noted the child did not want to complete her assignments at defendant's house because defendant refused to buy her supplies and does not take the time to show her how to complete the assignments. Plaintiff's girlfriend recounted how the child became upset recalling unflattering comments defendant and her boyfriend made about plaintiff's girlfriend. She stated the child was afraid to ask defendant for supplies for a school party because defendant was telling her "that they're poor, they don't have any money. Your dad needs to give me more money." The child said she was scared because "[h]er mom yells a lot and . . . makes her eyes real big and wide and it just scares her."

Defendant testified consistent with her certification in opposition to plaintiff's motion. She claimed she agreed to the equal shared parenting plan

A-0420-19T2

under duress because otherwise she would be responsible to pay plaintiff's attorneys fees. Defendant denied plaintiff's claims that she had violated the 2017 consent order. Although she claimed there had been no change in circumstances since entry of the order to warrant another modification of custody or parenting time, she testified that the child's behavior and defendant's relationship with plaintiff worsened since the advent of the shared parenting arrangement. She denied she and the child needed therapy asserting instead that the child's behavior was driven by her relationship with her father and his girlfriend stating: "For those moments where it's all three of us together, she has acted more where she needs to be divisive. She needs to show [plaintiff and his girlfriend] that she is all for them and that she'll run away from me." She claimed plaintiff's reason for seeking primary residential custody was to prevent her from an intrastate move.

Defendant claimed she obtained a separate phone for the child because "there was tracking information on the [phone] . . . [and she] felt it better to not have [plaintiff and his girlfriend] use this tool for whatever tracking and [the child] could have a phone at [defendant's] house to use." Defendant did not deny that she compelled plaintiff to communicate with the child through her. She testified she told plaintiff "if you want to talk to her, let me know. If I want to

talk to her, I'll let you know." Defendant claimed the trips to see her boyfriend were vacations and described the activities she and the child did together and activities she had the child do alone.

Defendant adduced testimony from her expert who indicated he was retained to review the court-appointed expert's report. Defendant's expert did no independent testing of his own. Although he criticized the court-appointed expert for not furnishing the numeric MCMI test results, defendant's expert stated he does not administer the MCMI to measure parenting. He also testified he does not administer the RSCT because it subjective, but claimed the PSI test was reliable and showed both parties were doing well raising the child. Defendant's expert also noted the court-appointed expert did not perform a home visit and also denied defendant needed therapy, claiming the court-appointed expert's recommendation for individual therapy for defendant was because she took the parties' daughter to church.

Defendant's expert opined the child was not old enough to express her views on custody. He stated: "I mean it's my understanding that – I could be wrong with this, . . . the child must be [fourteen] for the [c]ourt to really seriously take – for them to have a voice with the [c]ourt?" He also stated: "I'm not going to disagree with [the court-appointed expert] that . . . [the child] has a

A-0420-19T2

better time and receives more attention with [defendant and his girlfriend]" however, he opined reducing parenting time worsens the relationship with the disfavored parent because the child would think the following:

> We went to [c]ourt. I talked to the [j]udge. The [j]udge considered it. Mommy is the bad mommy. . . . And everything that daddy has been doing -- yeah, that's the kind of parenting that I'm entitled to and from now on when mommy does not measure up to that, she's continuing to be a bad mommy. . . . And I'm going to run to daddy and maybe we can even take more time away from mommy.
>
> You know that's a hypothetical. I can't prove it, but that's what I typically see occurring, that the research indicates that the more time a child spends with a parent, the closer they get.

On cross-examination he conceded he could not say whether the court-appointed expert's recommendations were appropriate because he did not perform an evaluation.

The trial judge rendered an oral opinion in which he addressed every statutory custody factor and the relief sought by the parties. Regarding the statutory factors, he noted the parties lived ten minutes apart and their job responsibilities and stability of home environment were not determinative of the custody dispute. He also found the statutory factors regarding the child's safety,

19

the parties' safety vis-à-vis one another, the parties' willingness to accept custody or parental fitness were not dispositive.

Regarding defendant's expert the judge stated:

> He interviewed no one. He in essence gave a rather interesting account of his views of parenting, . . . parenting styles, [and] his views on input. He made some suggestions which were not supported factually. He wasn't here to hear the facts.
>
>     . . . .
>
>     He critiqued [the court-appointed expert's] report insofar as the . . . utilization of test[ing] . . . , but basically he had no dispute at with [the expert's] report . . . . I find it interesting to know with respect to [defendant's expert's] conclusions, . . . and I'm not sure that they were factual conclusions at all in the context of this case, insofar as he was missing information.
>
> . . . [H]is conclusions were generalizations as opposed to specifics that could be applied in this particular case.
>
> . . . I didn't think [defendant's expert] was well acquainted with the fact that these folks have been at this for over a decade. . . .
>
>     He also spoke in terms of punishment with respect to an adjustment in parenting time or the designation of parent of primary residence. This [c]ourt does not perceive an alteration to be punishment. This [c]ourt's concern is primarily with the best interest of the child. . . .

Referencing his interview of the child, the judge concluded as follows: "She clearly loves everybody. She's perfectly happy with the situation with respect to her comfort level as to the emotional attachment. It's the emotional detachment that this [c]ourt's [concerned with] because there have been patterns of noncompliance. I don't perceive a change in parenting time to be undermining parental rights."

The judge found the court-appointed expert's conclusions "very consistent with respect to the results of his objective tests and their overlay with respect to his analysis of each of the parties." Referencing the parties' testimony, the judge stated: "I found [the court-appointed expert's] behavioral observations were consistent with the results of the objective tests and, frankly, they were consistent with my observations in court and my evaluation of credibility."

The judge concluded plaintiff's testimony was "sincere and forthcoming . . . [and] credible and believable . . . . I didn't get the sense either from talking to [plaintiff] or . . . [the child] . . . that it was whatever [the child] wanted goes. . . . The impression I got . . . was that [the child] had input." The judge found plaintiff's girlfriend credible stating: "I never got the impression that she was attempting to substitute herself for [defendant]." Conversely, the judge found defendant's testimony inconsistent, which he "found had to do with her

attempt . . . to put herself in a better light with respect to explaining away some of the things she had done with respect to any noncompliance with orders, noncompliance with things that should have been resolved in a family discussion."

The judge concluded plaintiff was more attuned to the child's emotional needs because "[s]he got input at [plaintiff's] house [and] didn't get any input at [defendant's] house[.]" He stated: "I'm convinced that something else is going on with [defendant] . . . mostly relating around the parenting issues and her relationship with [plaintiff] and [his girlfriend]."

The judge concluded the statutory factor addressing the time each parent enjoyed with the child previously did not control because the fact that defendant had equal time with the child did not prove it was quality time. The judge concluded the parties' daughter was mature, bright, and "knows her own mind." "She wants to spend more time [plaintiff] and [his girlfriend], not because she doesn't like [defendant], but because there are some things about that family dynamic that she enjoys."

The judge found the evidence established plaintiff's claims that defendant failed to take the child to her extracurricular activities and had deprived her of relationships with other children and the ability to make new acquaintances. He

concluded defendant incorrectly believed that as parent of primary residence she could change her address without giving plaintiff notice and that "[t]he CCD situation . . . was so egregious" because she failed to provide plaintiff with "any information whatsoever . . . ." He found defendant failed to inform plaintiff "about the orthodontist until the [eleventh] hour and then when [plaintiff] finally finds out [defendant] already signed the contract . . . [was] [a]bsolutely outrageous conduct."

Concluding the statutory factors preponderated in plaintiff's favor, the judge designated him parent of primary residence and continued joint legal custody. The judge gave plaintiff primary decision-making authority regarding the child's activities and medical appointments, requiring plaintiff to provide defendant with forty-five days' notice. The judge ordered each party could have three weeks of vacation, required the parties to give each other forty-five days' notice for vacations, and to provide itineraries to the non-vacationing parent. The judge ordered parenting time on alternating weeks from Wednesday until Monday morning, noting "I do this not to cut down on time, but to perpetuate quality time. . . . This formulation will give everybody a full weekend. It will give [the child] a week and a half in one place to do her homework. She talked about scrambling . . . getting homework done on Monday and Tuesday . . . ."

A-0420-19T2

The judge ordered defendant to sign the child's passport renewal form and plaintiff to hold the passport. He ordered the child to remain in the Pitman schools and plaintiff to pay the tuition if it is required. He also ordered the child to have a telephone provided by plaintiff and neither party would block the child's phone, including as a means of disciplining her. The judge ordered the parties to continue using a co-parenting application they had been utilizing as a form of communication, scheduling, and document sharing.

The judge gave the parties five days to submit certifications for counsel fees and ultimately decided each party would bear his and her own fees, respectively. However, the judge ordered defendant bear $7500 of the court-appointed expert's total fees of $22,500, allowing her to pay $3500 within thirty days and the remaining $3500 within sixty days.

Defendant raises the following points on appeal:

> I. A CHANGE IN CUSTODY REQUIRES A SIGNIFICANT CHANGE IN CIRCUMSTANCE.
>
> II. THE COURT MUST CONSIDER THE BEST INTERESTS OF THE CHILD.
>
> III. JOINT LEGAL CUSTODY INCLUDES PROVISIONS FOR CONSULTATION BETWEEN THE PARENTS IN MAKING MAJOR DECISIONS REGARDING THE CHILD'S HEALTH, EDUCATION, AND GENERAL WELFARE. (The legal argument was not raised below.)

IV. THE COURT HAS SPECIFIC GUIDELINES REGARDING THE QUALIFICATIONS OF EXPERT REPORTS. (The legal argument was not raised below.)

V. THE COURT SHOULD CONSIDER ALL FACTORS IN [RULE] 5:3-5(C) FOR THE AWARD OF EXPERT FEES. (The legal argument was not raised below.)

In her reply brief, defendant raises the following additional points:

I. THE COURT IS REQUIRED TO DISCUSS THE SUPPORT FOR ITS DECISION TO AWARD EXPERT FEES.

II. THE COURT SHOULD NOT OVER-EMPHASIZE THE MATERIAL HAPPINESS OF THE CHILD WHEN DETERMINING THE WELFARE OF THE CHILD.

An appellate court's scope of review of the Family Part's factfinding function is limited. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012). Factual findings "are binding on appeal when supported by adequate, substantial, credible evidence." O'Connor v. O'Connor, 349 N.J. Super. 381, 400-01 (App. Div. 2012) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding[,]" and the conclusions that flow logically from those findings of fact. Cesare, 154 N.J. at 413. "Although we defer to the trial court's findings

of fact, especially when credibility determinations are involved, we do not defer on questions of law." N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011) (citing N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88-89 (App. Div. 2006)).

> In custody cases, it is well settled that the court's primary consideration is the best interests of the children. . . .  The court must focus on the "safety, happiness, physical, mental and moral welfare" of the children. Fantony v. Fantony, 21 N.J. 525, 536 (1956). See also P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999) ("In issues of custody and visitation '[t]he question is always what is in the best interests of the children, no matter what the parties have agreed to.'"). . . .  Custody issues are resolved using a best interests analysis that gives weight to the factors set forth in N.J.S.A. 9:2-4(c).

> [Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citations omitted) (emphasis added).]

Moreover, Rule 5:3-7(a)(6) authorizes a court to modify custody upon finding a violation of a custody or parenting time order as long as the modification is in the best interest of the child and the court applies the N.J.S.A. 9:2-4(c) factors. A.J. v. R.J., 461 N.J. Super. 173, 181-82 (App. Div. 2019).

We reject the arguments raised in points I and II of defendant's brief that there was no change in circumstances affecting the child's welfare because custody had only recently been modified, the child was excelling in school, and

the child raised no concerns regarding her welfare during her interview with the judge. The record is evident that despite the December 2017 consent order, defendant violated the order in ways which impacted the child's welfare and plaintiff's ability to co-parent. Moreover, the child's grades improved because of plaintiff's increased custodial role and the expert and fact testimony supported the judge's conclusion designating plaintiff as the primary residence would enhance the child's stability.

Our Supreme Court has stated: "Joint legal custody, meaning the 'authority and responsibility for making "major" decisions regarding the child's welfare,' is often shared post-[separation] by both parents. Joint legal custody provides rights and responsibilities to custodial parents, but it also confers rights with less significant responsibilities to non-custodial parents." Pascale v. Pascale, 140 N.J. 583, 596 (1995) (citation omitted).

> In cases of . . . joint legal custody, the roles that both parents play in their children's lives differ depending on their custodial functions. . . .
>
> Although both . . . [legal and physical custody] create responsibility over children of [separated parents], the primary caretaker has the greater physical and emotional role.
>
> [Id. at 597-98.]

The Court stated: "[T]he many tasks that make one parent the primary, rather than secondary, caretaker [include]: . . . purchasing, cleaning, and caring for clothes; medical care, including nursing and general trips to physicians; arranging for social interaction among peers; . . . disciplining; and educating the child . . . ." Id. at 598-99.

Contrary to defendant's argument in Point III, the trial judge did not strip her of rights as a joint legal custodian. The judge adhered to Pascale by designating plaintiff the primary residential parent and vesting him with primary decision making authority, but also requiring he provide ample notice to defendant to enable her participation or to file a motion in opposition.

N.J.S.A. 9:2-4(c) requires the trial judge to consider "the preference of the child [regarding custody] when of sufficient age and capacity to reason so as to form an intelligent decision . . . ." In Lavene v. Lavene, 148 N.J. Super. 267, 278 (App. Div. 1977), we reversed a custody determination where it was not apparent the trial judge interviewed the parties' eight and one-half year-old child. We stated:

> While a child of that age would clearly lack the maturity and judgment to make a dispositive statement of custodial preference, nevertheless it is our view that her preference and the reasons therefor, if she wished to express them, ought to be a factor which the court should consider along with all of the other relevant

factors. The age of the child certainly affects the quantum of weight that his or her preference should be accorded, but unless the trial judge expressly finds as a result of its interview either that the child lacks capacity to form an intelligent preference or that the child does not wish to express a preference, the child should be afforded the opportunity to make her views known. We would think that any child of school age, absent the express findings we have indicated, should have that opportunity and that the judge would be assisted thereby.

[Id. at 271-72 (emphasis added).]

We reject the argument raised in Point II of defendant's reply brief, which echoes the claims made by her expert at trial asserting the judge placed too much emphasis on the preferences of the parties' daughter in deciding custody. Plaintiff, his girlfriend, the court-appointed expert, and the judge after interviewing the child, all recognized the child was mature for her age. Defendant's argument regarding the child's ability to express a preference and the weight to be given it is unsupported by the facts or the law. Her expert espoused a rule that had no scientific or legal basis. Notwithstanding, the child's preference for custody was not adopted by the trial judge. In designating plaintiff the parent of primary residence and awarding him an additional overnight, the judge gave appropriate weight to the child's preference citing the

conflicts she endured with defendant relating to schoolwork, extracurricular activities, and defendant making unilateral travel plans.

In Point IV of defendant's brief, she argues plaintiff's expert offered a net opinion lacking in facts and data, conducted no home visit, and testified beyond his report. These arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only that the parties' living circumstances were not a factor in the modification of custody in the expert's recommendation, the judge's determination, or in the child's view.

Finally, we reject the arguments raised in Point V of defendant's initial brief and Point I of her reply brief alleging the expert fee award was in error. The court has broad authority to make an award of expert fees. N.J.S.A. 2A:34-23. Rule 5:3-3(i) states: "When the court appoints a . . . mental health . . . expert . . . pursuant to [Rule] 5:3-3(b), . . . the court may direct who shall pay the cost of such . . . report." "Paragraph (i) of the rule leaves to the court's discretion the issue of payment of the court-appointed expert's fees." Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 5:3-3(i) (2017).

Although plaintiff out earned defendant, the parties stipulated defendant's earnings were $70,000 per year. Given the circumstances, the reasonableness of the parties' positions, the outcome of the trial, and defendant's ability to retain

her own expert, requiring defendant to bear one-third of the court-appointed

expert's fees was not an abuse of discretion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0420-19T2