**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2908-18

KYLE DOUGHTY,

    Plaintiff-Appellant,

v.

JAYME BECK, f/k/a
JAYME L. DOUGHTY,

    Defendant-Respondent.

_____

              Submitted March 30, 2020 – Decided October 21, 2021

              Before Judges Ostrer, Vernoia, and Susswein.

              On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FD-01-0687-15.

              Russell & Marinucci, PA, attorneys for appellant (Marla Marinucci, on the brief).

              Respondent has not filed a brief.

    The opinion of the court was delivered by

OSTRER, J.A.D.

This is a post-judgment child custody dispute. Plaintiff Kyle Doughty and defendant Jayme Beck (formerly Doughty) divorced, settled equitable distribution, and agreed to joint legal custody and evenly shared physical custody of their young daughter ("Daughter") until she began school. Their shared custody arrangement was no easy feat, because Doughty lives in New Jersey and Beck lives in Kansas. The parties transferred custody every month or more, usually in Ohio after long road trips. The parents' geography also guaranteed their shared custody arrangement would be short-lived. As the start of kindergarten approached, each parent sought physical custody during school years, leaving the other with custody during summer and school breaks.

After a testimonial hearing, the court determined Doughty and Beck were both fit and loving parents but that granting Beck physical custody during the school year and making her the parent of primary residence (PPR) best served Daughter's interests. The court awarded Doughty physical custody during summer and school breaks and made him the parent of alternate residence (PAR). The court later denied Doughty's motion for reconsideration.

Doughty appeals, contending the court's factual findings lacked evidential support. After carefully reviewing the trial record, we agree some of the trial

A-2908-18

court's findings are unsupported.  Nonetheless, the errors were not "clearly capable of producing an unjust result."  R. 2:10-2.  Therefore, we affirm.

## I.

The parties married in Kansas in 2011 while Doughty, a New Jerseyan, served in the U.S. Army there.  Beck is a Kansan.  Daughter was born almost a year later.  For a while after Doughty's honorable discharge, the young family lived with Beck's parents in Kansas, but they relocated to New Jersey when Daughter was less than a year-and-a-half.  They moved into Doughty's parent's home.  Doughty found work and Beck stayed home with Daughter.

After nine months here, Doughty acquiesced to Beck's desire to return to Kansas.  Beck and Daughter moved first, and Doughty planned to join them once he found work there.  But, the following month, Beck told Doughty (soon after he interviewed for a Kansas job) that she wanted a divorce.  They dispute what prompted her decision.  Doughty returned to New Jersey alone, after Beck refused to permit him to leave with Daughter.

Beck filed for a divorce in Kansas in November 2014.  Without a hearing, the Kansas court granted the parties joint custody of Daughter and barred

3

Doughty from removing Daughter from Kansas. The Kansas court also ordered Doughty to pay $300 a month in child support.[1]

In New Jersey, Doughty immediately applied under an FD docket for Daughter's return to New Jersey. The court denied emergent relief, and Doughty was separated from Daughter for several months. But in multiple orders issued in 2015, the court established jurisdiction over custody with the Kansas court's concurrence, granted Doughty extended periods of parenting time in New Jersey, ordered daily phone or Facetime contact between the child and the parent not present, and established joint legal custody pendente lite, with Beck as PPR and Doughty as PAR. A plenary hearing that began in August 2015 was halted when the parties agreed in principle to share physical custody until Daughter started school.

The agreement followed months of antagonistic email and text exchanges between the parties. Beck frequently went off on hostile and vulgar tirades against Doughty, and often threatened to deny him physical and Facetime contact with Daughter. Beck also withheld information about Daughter's routine medical care. Doughty usually demonstrated restraint, but he at times demeaned

---

[1] The Kansas order is not in the record on appeal. We rely on a certification from Doughty on the child custody provisions and Beck's testimony on the child support provision.

Beck's intelligence. One source of friction was Beck's romantic relationship in early 2015 with Jeremy Beck, the man she would later marry.[2] Also, for a period in 2015, unbeknownst to Beck, her iPhone's tracking function remained open to Doughty, who informed Beck he knew her whereabouts, falsely stating he hired a private investigator. Beck alleged Doughty was stalking her.

The court memorialized the parties' agreement in a September 8, 2015 order, which required them to submit parenting time plans within two weeks "with the understanding that the parties would like to share roughly equal time with the child until the child reaches school age and leaving the issue of which party will be the [PPR] . . . open." The order stated that Daughter "shall remain in New Jersey with [Doughty] for the next thirty (30) days."

The parties' plans differed. Doughty proposed that he and Beck alternate parenting time periods of roughly forty-five days, with the first period being an extension of the thirty days that began September 8 and was scheduled to end October 8. Beck wanted the parties to alternate thirty-day periods.

As October 8 approached, Doughty's counsel asked the court whether Doughty could keep Daughter pending the court's decision on the parenting

---

[2] To avoid confusion with Beck, we will refer to Jeremy Beck as "Jeremy," and mean no disrespect in doing so.

5

plans. Doughty also expressed concerns about being present for future exchanges because of restraints that, according to Beck's counsel, the Kansas divorce court had issued. Although the court did not respond to Doughty's counsel's inquiry or a subsequent one, Doughty kept the child. That prompted Beck to seek help securing Daughter's return. The trial court then directed, through a law clerk, that Doughty return Daughter to Beck on October 25, 2015, where she was to remain until December 10, 2015.[3]

Then, according to Doughty's counsel, Beck said she would not return Daughter without a formal order commanding her return. So, on December 4, 2015, the court entered an order directing Beck to return Daughter to Doughty in five days. In an apparent attempt to equalize parenting time, the court ordered that Daughter would alternate between New Jersey and Kansas "for as many days" as Daughter was just in Kansas.

The court then resolved the parties' disparate parenting time plans. By order dated February 8, 2016, the court established alternating thirty-day parenting-time periods, with exchanges in Dayton, Ohio (a ten-hour drive for

---

[3] The record includes no order. Rather, according to Doughty's counsel, the judge's law clerk orally advised counsel that "per the Court's directive," Daughter was to return to Kansas on October 25, 2015 and remain there "for the same amount of time the child was in New Jersey."

A-2908-18

both parties).  The court continued joint legal custody and postponed PPR designation.  Based on the assumption that Daughter's principal treating pediatrician was located here, the court designated Doughty as the PPR for Daughter's medical needs and required both parties to share the child's health information with the other.  The court also awarded Beck a modest amount of child support and made Doughty responsible for sixty-six percent of unreimbursed health expenses, and Beck responsible for thirty-four percent.[4]

The court required the parties to provide each other with their residential addresses, a cell phone number, and an email address, but the court adopted a provision of the Kansas divorce court's order, limiting Doughty to email communications regarding the child.[5]  The court wrote in its accompanying decision, "The parties would be fool hardy not to have each other's contact information in the event that an emergency arises."

---

[4]  The child support order and worksheet are not included in the record.

[5]  The New Jersey court's order was not crystal clear.  On the one hand, the order stated, "Father shall be provided with Mother's residential address, her cell phone number, and email address that he is to use to communicate with Mother regarding the child immediately."  On the other hand, the order stated, "The Order of the Kansas Court shall be upheld.  Father shall not contact Mother or authorize others to contact her unless there is an emergency."  A copy of the Kansas order is not in the record.

A-2908-18

A month later, the Kansas court entered a final judgment of divorce. The court did so despite Doughty's contention it lacked jurisdiction because when Beck filed her complaint back in November 2014, she had not resided in Kansas the requisite sixty days.[6] Beck then married Jeremy.

In the year and a half following the court's February 2016 order, the parties successfully shared physical custody. But their emails continued to reflect discord between them. Beck often struck a conciliatory tone when she sought accommodations or adjustments from Doughty on such things as scheduling Facetime, but she lashed out when she did not get her way. Doughty doggedly sought and ultimately secured Beck's agreement to extend the parenting time periods from thirty days to forty or more. Despite the court's order declaring Doughty the medical PPR, Beck obtained routine health care for Daughter and questioned Doughty's attention to Daughter's health conditions. Both parties objected when the other took some unilateral action related to Daughter's health;

---

[6] Doughty ultimately prevailed on appeal the following year. In re Marriage of Doughty, 394 P.3d 904 (Kan. Ct. App. 2017). Doughty then filed for divorce here. The trial court here promptly entered a final judgment of divorce (FJOD) after bifurcating the issues of equitable distribution and custody. After the parties later settled equitable distribution, the court entered an amended FJOD, which is not in the record.

A-2908-18

and Doughty repeatedly sought more details about Daughter's health care than Beck was willing to provide.

With the prospect of Daughter beginning kindergarten, the parties filed competing applications to be designated PPR. The plenary hearing began in mid-August 2017, and it soon became clear it would not finish before school started in New Jersey; and it had already started in Kansas. So, the court temporarily ordered Daughter to start kindergarten in New Jersey.

The sole witnesses at the trial were Doughty, Beck, and Doughty's mother, Laurie Doughty[7] A manager for a rail line, Doughty testified he worked 6:00 a.m. to 3:00 p.m. Monday through Friday and retained some flexibility over his hours. He still lived with his parents in a large house that included an apartment for him and a separate bedroom for Daughter. Doughty's retired father helped Daughter get on the bus in the morning, but Doughty was able to parent Daughter after her school day. Laurie also helped with childcare responsibilities. Doughty acknowledged that his father smoked cigarettes but did so outside the house to shield Daughter from second-hand smoke. Doughty asserted he repeatedly offered to support Beck and Daughter financially after

---

[7] To avoid confusion with Doughty, we will refer to Laurie Doughty as "Laurie," and mean no disrespect in doing so.

A-2908-18

their separation, but Beck refused to use a credit card he offered. Throughout Daughter's life he sent materials, such as diapers. He rejected Beck's request that he pay child support in accord with the order of the Kansas court, which he maintained lacked jurisdiction.

Doughty also defended his decision to withhold Daughter in October 2015, explaining his attorney tried to obtain direction from the court. He stated he had appropriately met Daughter's health care needs during the shared-custody period, and asserted that Beck flouted his designation as the medical PPR by obtaining duplicative care. He also asserted that Beck interposed obstacles to his regular Facetime contact with Daughter and withheld contact information the court required she disclose. He also presented numerous email conversations in which Beck was intemperate and resorted to vulgar language.

An owner of long guns, Doughty stated he properly stored them and that they posed no danger to Daughter. He defended taking a photo of Daughter, then two years old, holding an unloaded rifle. Doughty said he was not a church-goer, but his mother regularly attended church with Daughter.

Beck testified that Daughter could attend the elementary school in a nearby school district where Beck worked as a classroom aide for special needs students. Beck and her husband, a construction foreman, lived with their new

child at Beck's parents' home. Daughter had her own bedroom (but she shared it with her step-sister when she visited). Beck said Daughter was close with her step-sister, who was a couple years older than she, and a cousin who was the same age as Daughter. Beck said she was an observant Catholic, and regularly took Daughter to church.

Beck contended that Doughty was controlling during the marriage. She said he interfered with her prior friendships, monitored her communications, oversaw her spending, and sometimes took her cell phone and car keys. She complained that Doughty did not comply with the Kansas support order but admitted that she refused Doughty's other offers of assistance, perceiving them as controlling. She also said he was verbally abusive during the marriage; physically restrained her once when she was pregnant; and, one time, backed her into a corner and punched the wall. Beck conceded that she used inappropriate language in her past communications with Doughty; acknowledged it was wrong; and insisted that she had matured and rarely resorted to such language. She contended that both parties had improved their manner of communications and co-parenting skills, although there were still discordant exchanges.

A-2908-18

Doughty's attorney confronted Beck with numerous email exchanges as well as conversations that Doughty recorded without Beck's knowledge. Many showed Beck to be mercurial, hot-tempered, and insulting to Doughty. But Beck's counsel argued that one recording worked in her favor. Referring to their marriage's breakup, Beck told Doughty at one point that she "wanted a husband, not someone who degrades. Not someone who's in an angry mood all the time, who's mentally abusive, every five seconds mad about something, hitting something, who restrains his wife." Although Doughty often chose not to respond to Beck's attacks, Beck's counsel argued that Doughty's silence in that instance suggested that Beck spoke the truth.

Beck acknowledged that she did not comply with the New Jersey court's order that directed her to provide her contact information to Doughty. She said that the New Jersey order conflicted with the Kansas divorce judgment.

Beck explained that because the Kansas school year started and ended several weeks earlier than the New Jersey school year, she would have to work the latter part of Daughter's summer break, if that were when she exercised physical custody. Beck proposed that she be awarded PPR status after Daughter's current school year, to avoid disruption.

12

Both parties portrayed themselves as involved, attentive parents during the marriage, and minimized the role of the other. Doughty said he handled feeding and diapering after work; and Beck often became overwhelmed and watched a lot of television. Beck said that she was Daughter's primary caregiver, and Doughty spent much of his free time playing video games, rather than with Daughter. Beck said Doughty minimized Daughter's asthma and other ailments, and Doughty contended Beck exaggerated Daughter's needs.

Laurie confirmed that her husband smoked a half a pack of cigarettes a day outside on their covered porch and acknowledged that when Daughter and Beck lived with them, he sometimes smoked "in the master bedroom in the bathroom with the fan on" and "in the living room on a rare occasion." Laurie also said that Daughter's New Jersey pediatrician said she did not have asthma. Laurie asserted that Beck was unwilling to work, used profanity around Daughter, and rarely left the house to socialize.

Laurie described Doughty as a hands-on dad who was usually calm and easygoing, and Beck often became easily frustrated with Daughter and would become angry and irrational. Laurie contended that Doughty did more to foster Daughter's relationship with Beck than Beck did to foster Daughter's relationship with Doughty. Laurie also confirmed aspects of Doughty's

A-2908-18

testimony. She opined that her son should be designated the PPR because he was more even-tempered, could provide a more stable, consistent environment, and would facilitate a relationship with Beck.

II.

Shortly before Daughter started first grade, the court entered its order granting Beck physical custody during the school year, designating her PPR, granting Doughty physical custody during summer breaks, and designating him PAR.

In its oral opinion, the court addressed the fourteen statutory factors that a court "shall consider" in a custody decision. N.J.S.A. 9:2-4.[8] Regarding factor

---

[8] N.J.S.A. 9:2-4(c) states:

> In making an award of custody, the court shall consider but not be limited to the following factors: [1] the parents' ability to agree, communicate and cooperate in matters relating to the child; [2] the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; [3] the interaction and relationship of the child with its parents and siblings; [4] the history of domestic violence, if any; [5] the safety of the child and the safety of either parent from physical abuse by the other parent; [6] the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; [7] the needs of the child; [8] the stability of the home environment offered; [9] the quality and

14

one — the parents' ability to agree, communicate and cooperate in matters relating to the child — the court concluded that the record included "numerous incidents of the parties not communicating adequately, [and] communicating to each other in an insulting way." The court singled Doughty out for speaking condescendingly, and Beck for using profanity. But the court concluded that a "[m]ajor consideration . . . was the disdain that . . . Doughty seemed to have for . . . Beck in the communications that he brought to the Court's attention."

Regarding factor two — the parents' willingness to accept custody and any history of unwillingness to allow parenting time — the court recognized that both parents wanted custody. The court noted that Doughty intentionally refused to abide by the court's September 8, 2015 order to transfer custody after thirty days (the court inaccurately stated that he did not seek clarification from the court). The court also noted his efforts to change pick up and drop off arrangements. Although the court acknowledged that Doughty correctly challenged the Kansas court's jurisdiction, the court found that Doughty "picked

continuity of the child's education; [10] the fitness of the parents; [11] the geographical proximity of the parents' homes; [12] the extent and quality of the time spent with the child prior to or subsequent to the separation; [13] the parents' employment responsibilities; and [14] the age and number of the children.

A-2908-18

and chose what orders he was going to comply with," and the court stated it lacked "confidence . . . that . . . Doughty won't play games with the custody." Although the court acknowledged communications in which Beck was "not agreeing to give the child for visitation or not agreeing to FaceTime," the court expressed confidence that Beck would comply with the court's orders and would be flexible when necessary.

As for Daughter's interactions with her parents and siblings — factor three — the court found that Beck was the child's primary caretaker during the marriage. The court also found that Daughter was very close to her step-sister and cousin. The court concluded that both parties were close to their nuclear families, but Doughty did not maintain ties with extended family as much as Beck did.

The court gave no weight to the history of domestic violence — factor four — and rejected Beck's stalking claims, concluding "she just didn't understand that she had location services on her phone."

The court also found that factor five — the safety of the child — did not favor either party. The court so concluded notwithstanding that Beck "took more of an active interest" in the child's health care. The court rejected Beck's suggestion that Doughty's gun ownership posed a safety risk to Daughter.

Another non-issue was the child's preference — factor six. The court concluded that the child "appears to care for both parties" and was bonded to both parties, notwithstanding Beck's argument that Daughter was "very bonded" to her.

Regarding factor seven, the court found that Daughter's "needs are clearly more appropriately served by . . . Beck." The court gave weight to the fact that Daughter would attend the school where Beck worked, which would enhance Beck's ability to assure Daughter's educational needs were met. The court also held that Beck "was appropriately taking [c]are of the child's medical needs" and credited Beck's testimony that Daughter suffered from anemia and asthma (the court also mistakenly noted that it had designated Beck the medical PPR). The court also found that Beck took an active interest in Daughter's religious life; and was involved in Daughter's other activities. The court concluded that Doughty was "missing some key information" about Daughter's teachers and school; specifically, he did not know the full name of Daughter's elementary school; he could not name her teachers; and he was absent from a parent-teacher conference that Laurie attended in his stead, and Beck attended remotely.

As for the stability of the home environments — factor eight — the court noted that Beck and Doughty both lived with their parents. Doughty intended

A-2908-18

to assume ownership of his parents' house. Beck and Jeremy intended eventually to obtain their own house. The court expressed some concern about Doughty's dependence on his mother's assistance, stating, "[O]ne wonders what would happen if [Laurie] were not around." The court also expressed concern about the risks of second-hand smoke in the home.

The court also indicated that granting Beck custody during the school year would enhance the quality and continuity of Daughter's education — factor nine — because Beck and Daughter would have identical schedules; Beck worked in education; and she would be present at Daughter's school. The court also noted that if Beck had custody in the summer, she would have to work to get ready for the coming school year while Daughter was with her.

The court found that both parties were fit parents — factor ten — and if one of them had to parent the child alone because the other parent was unavailable, "the child would be just fine." The court concluded that both parties had demonstrated immaturity — the court noting the nature of Beck's communications, Doughty's claim he hired a private investigator, and other false statements Doughty had made.

The court acknowledged that geographical proximity — actually, the lack of it — was "the major issue . . . because I think that these parties would be able

to manage their custody situation equally" if they lived near each other. The court found that it would be difficult for Beck and Jeremy to relocate to New Jersey, noting it would interfere with Jeremy's access to his daughter. The court also noted that Doughty declined to take the job in Kansas because of the marital discord.

Regarding the extent and quality of time spent before and after separation — factor twelve — the court found that Beck was the primary caretaker prior to the separation.

Regarding the parents' employment responsibilities — factor thirteen — the court appeared to find this factor favored Beck. The court noted that Doughty depends on his parents to handle some child-care responsibilities because of his work schedule. On the other hand, "Beck works where the child would go."

Finally, as for factor fourteen, the court noted that there was only one child of the marriage.

The court concluded that the factors favored designating Beck as the parent of primary residence. Also, Beck was more able than Doughty "to rise abo[ve] the animosity that I think pervaded this matter at the outset." The court ordered that Daughter begin residence with her mother immediately. The court

19 A-2908-18

ordered that Daughter would spend summers with Doughty, beginning one week after the end of the school year and ending one week before the start of the next school year. Aside from alternating Thanksgiving, Christmas, and Easter (although there were additional caveats regarding Easter), Doughty would exercise parenting time during school breaks. The court retained jurisdiction.

Doughty filed a motion for reconsideration, contending the court made various factual errors, including its findings that: (1) he acted improperly in appealing the Kansas divorce, notwithstanding Beck lied about her residence to obtain jurisdiction; (2) Beck always followed court orders when she violated the court's order to provide him with contact information; (3) Doughty was likely to "play games" with court orders as indicated by his failure to return Daughter in accordance with the September 8, 2015 order; (4) Beck was more likely to accommodate Doughty; (5) Beck was Daughter's PPR for medical issues; (6) Doughty repeatedly disparaged Beck in his emails; and (7) Doughty willfully failed to attend Daughter's parent teacher conference when in fact he was flying with Daughter to Kansas at the time of the meeting. Doughty argued that the court's erroneous findings indicated that it did not review the entire record and instead relied upon defense counsel's written summation.

A-2908-18

After hearing oral argument on February 1, 2019, the trial court denied Doughty's motion for reconsideration. The court explained that it reached its decision based on the totality of the circumstances, and no one factor or fact was dispositive. The court concluded that Beck was a different and more mature person than she was in 2015. The court generally defended its findings and its ultimate decision. The court acknowledged that it misstated that Beck was the medical PPR; and that it may have been unaware that Doughty was on a plane when he missed the parent-teacher conference. But those oversights did not change the court's determination that designating Beck the PPR and granting Beck physical custody during the school year served Daughter's best interests.

## III.

In his appeal from the court's orders, Doughty reprises many of the claims of error he raised on his motion for reconsideration.

We begin with our standard of review. We accord great deference to the Family Part's factual findings. They are binding if supported by "adequate, substantial, credible evidence," and we will disturb them only if they are so inconsistent with the trial record "as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). This limited scope of review is especially

appropriate given the Family Part's expertise and its opportunity to assess the parties' credibility based on live testimony.  Id. at 412.

A trial judge's child custody determination is "entitled to great weight and will not be lightly disturbed on appeal." DeVita v. DeVita, 145 N.J. Super. 120, 123 (App. Div. 1976).  Absent compelling circumstances, we are not free to substitute our judgment for that of the trial court, which has become familiar with the case.  Schwartz v. Schwartz, 68 N.J. Super. 223, 232 (App. Div. 1961). "A sharp departure from reasonableness must be demonstrated before our intercession can be expected."  Perkins v. Perkins, 159 N.J. Super. 243, 248 (App. Div. 1978) (discussing equitable distribution).

Decisions regarding the appropriate arrangement to resolve a custody dispute is left "to the sound discretion of the trial courts."  Pascale v. Pascale, 140 N.J. 583, 611 (1995); see also Beck v. Beck, 86 N.J. 480, 485 (1981).  The trial court's discretionary decisions — reflecting "conscientious judgment" and accounting for "the particular circumstances of the case" — are binding unless they lack "rational explanation, inexplicably depart[] from established policies, or rest[] on an impermissible basis."  Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (first quoting Hand v. Hand, 391 N.J. Super. 102, 111

(App. Div. 2007); and then quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Thus, not just any error will justify reversal. The error must underpin the court's ultimate determination and be "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Put another way, if a court's factual error is "surplusage in terms of the decisional result and not essential to support the judgment," we will consider the error harmless. Roe v. Roe, 253 N.J. Super. 418, 431 (App. Div. 1992).

However, we owe no special deference to the trial court's legal conclusions. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). The governing legal principles are well settled. "[T]he court may make such order . . . as to the care, custody, education and maintenance of the children . . . as the circumstances of the parties and the nature of the case shall render fit, reasonable and just . . . ." N.J.S.A. 2A:34-23. In deciding a child custody dispute, the rights of both parents are equal; neither is favored merely because of one's status as father or mother. N.J.S.A. 9:2-4. The polestar of the court's analysis is the child's best interests. See Kinsella v. Kinsella, 150 N.J. 276, 317 (1997); Fantony v. Fantony, 21 N.J. 525, 536 (1956). In deciding custody, the court must consider at least the fourteen statutory factors we have

already recited, N.J.S.A. 9:2-4(c), but the best-interests analysis is superimposed on the statutory analysis, Kinsella, 150 N.J. at 317. The best-interests analysis must include judgments about the child's "safety, happiness, physical, mental and moral welfare." Fantony, 21 N.J. at 536.

Applying this standard of review to the court's factual and legal findings, we are convinced that any errors the court made were not so significant as to justify disturbing the court's ultimate determination on custody.

Doughty challenges the court's finding that he intentionally violated court orders, and the court's concern that he might not obey orders in the future. We are not convinced the court erred. The court certainly overlooked the fact that Doughty's counsel inquired by letter whether Doughty could extend the thirty days of custody that began September 8, 2015, to coincide with his proposed parenting time plan. We also acknowledge the court could have attributed Doughty's actions to the advice of counsel. But absent a stay or further order, Doughty was obliged to comply with the court's order that granted him thirty days of parenting time and no more. See In re Hoboken Tchrs.' Ass'n, 147 N.J. Super. 240, 251 (App. Div. 1977) ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but absent a stay, he [or

24                                                           A-2908-18

she] must comply promptly with the order pending appeal." (quoting <u>Maness v. Meyers</u>, 419 U.S. 449, 458 (1975))).

There is additional support in the record for the court's concern about Doughty's obedience of court orders. Notably, Doughty refused to abide by the Kansas order to pay child support. We recognize that Doughty challenged, ultimately successfully, the Kansas court's jurisdiction. And we recognize that, at least in New Jersey, "a party may at his [or her] peril ignore an order which is beyond the jurisdiction of a court, meaning that he [or she] may in contempt proceedings . . . litigate the jurisdictional validity of the order and come out unscathed if the order falls on that account." <u>In re Carton</u>, 48 N.J. 9, 17 (1966). Nonetheless, Doughty could have chosen to obey the Kansas order for Daughter's benefit, and to seek any appropriate payment credit later. Doughty's choice — even if defensible in a contempt proceeding — nonetheless lends support for the court's concern about Doughty's future compliance with court orders.

Furthermore, because the court's finding relates to a prediction about the future, it is inherently imprecise and one entrusted to the trial court's reasoned discretion. <u>Cf.</u> <u>State v. F.E.D.</u>, ___ N.J. Super. ___, ___ (App. Div.) (slip op. at 27-28) (noting that a compassionate release decision should be reviewed for

abuse of discretion because of its uncertain predictive nature), certif. granted, ___ N.J. ___ (2021). Therefore, we discern no abuse of discretion here.

Doughty also correctly noted that the court mistakenly identified Beck as Daughter's PPR for medical issues. However, on reconsideration, the court acknowledged the error and concluded it had no impact on its ultimate determination. We have no basis to disagree. Regardless of the designation, there was sufficient credible evidence in the record to support the court's finding that Beck was primarily responsible for Daughter's medical needs during the marriage. Notably, neither party chose to present medical expert testimony or even medical records on whether Daughter suffered from asthma and anemia. Instead, they relied on unobjected hearsay as to what doctors allegedly said. The court chose to credit Beck. We must defer to that finding, which in turn tends to support the court's conclusion that Beck was more attentive to Daughter's medical needs.

There is also sufficient evidence in the record to support the court's finding that Beck was better situated than Doughty to satisfy Daughter's educational needs. We recognize the court was unaware that Doughty had a good reason to miss a parent-teacher conference; he was flying to Kansas with Daughter. And a different fact-finder may reasonably have given less weight

than the court did here to the fact that Doughty did not know the full name of Daughter's elementary school — he correctly identified it as "Shaner Elementary" — and he could not rattle off the names of teachers at the school. Nonetheless, Beck's presence in the school that Daughter would attend gave her an opportunity Doughty could not match to meet Daughter's educational needs.

Doughty also misses the mark in challenging the court's alleged finding that Beck "always followed court orders." The court did not find that Beck "always followed court orders." Rather, the court found that Beck "wanted to follow the order" specifically pertaining to the pick-up and drop-off time and place.

Doughty also argues the court should have faulted Beck for failing to provide contact information in compliance with its order. While we do not excuse Beck's non-compliance, she explained that she was subject to a contrary order from Kansas. We also do not condone Beck's decision to obtain routine care for Daughter despite Doughty's designation as the medical PPR. However, the court stated that its confusion about who was the medical PPR did not affect its ultimate determination.

We also reject Doughty's contention that the trial court abused its discretion by relying on text messages "only to the extent they were beneficial

27

to [Beck] and unfavorable towards [him]," and by finding Beck more willing to compromise than he was. The trial court strongly criticized Beck's manner of communication. However, Beck acknowledged she was wrong to communicate the way she had, and she expressed her commitment to communicate civilly and maturely in the future. The court credited Beck on that score.

We recognize a different fact-finder may have been more skeptical of Beck. Her emails to Doughty in the weeks and months before the plenary hearing continued to demonstrate a short temper and a sharp tongue when she did not get her way or when she wanted to protect her parenting prerogatives. By contrast, Doughty invariably was restrained and polite. But it is not our job to decide the case anew. There was sufficient credible evidence in the record for the court's findings.

Doughty also contends the trial court erred in finding that he did not properly support Daughter. Doughty misstates the court's finding. The court concluded that Doughty attempted to exercise control over Beck by how he offered support. The court's finding was not so wide of the mark that we are compelled to correct it. Doughty declined to send support in compliance with the Kansas order, or to send cash on a regular basis. He proposed that Beck use a credit card and he sent a gift card (which she requested) — both of which

enabled him to monitor or limit what Beck purchased. We recognize that Doughty challenged the Kansas court's jurisdiction. He also argued that if he paid child support, it would be used to reimburse the State of Kansas for benefits he believed Beck received, rather than benefit Daughter. Nonetheless, there was sufficient evidence for the court to draw the inference it did.

We also reject Doughty's challenge to the court's finding that Beck testified more credibly than he did, and the court's decision to give relatively little weight to Laurie's testimony. Matters of credibility are quintessentially matters left to the trial court, which had the opportunity to assess the parties' demeanor. Cesare, 154 N.J. at 412.

Doughty's remaining arguments, including his argument that the trial court was biased against him and relied unduly on Beck's written summation, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We add only these brief comments. It would undoubtedly have been in Daughter's best interests if Beck and Doughty lived close to each other. That would have enabled Daughter to enjoy the time, attention, and guidance of both parents in equal measure. But that was not to be. So, the trial court was obliged to make a difficult decision that would deeply disappoint one parent. But

weighing and assessing the statutory factors is far from a mathematical exercise. And a PAR is no less a parent than the PPR, and, once granted joint legal custody as here, is a full partner when it comes to major decisions regarding the child's welfare. Pascale, 140 N.J. at 596. As we are satisfied that the court was guided by the child's best interests, and appropriately applied the statutory factors, the court's orders command our respect.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2908-18